# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MOSLEY,<br><br>       Plaintiff,<br><br>   v.<br><br>ASHLEY FURNITURE INDUSTRIES, INC.,<br>et al.,<br><br>       Defendants. | Case No. 1:18-cv-00557-SAB<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF No. 17) |

Currently before the Court is Defendants Ashley Furniture Industries, Inc.'s ("AFI"), and Stoneledge Furniture, LLC's ("Stoneledge") (collectively "Defendants"), motion for summary judgment or partial summary judgment against Plaintiff James Mosley ("Mosley" or "Plaintiff"). The Court heard oral argument on May 15, 2019. Counsel John Migliazzo appeared for Plaintiff and counsel Bradley Schwan appeared for Defendants. Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the May 15, 2019 hearing, as well as the Court's file, the Court issues the following order.

## I.

## PROCEDURAL HISTORY

On March 15, 2018, Plaintiff commenced this action by filing a complaint in the Superior Court of California, County of Tulare, bearing Case No. 273167. (ECF Nos. 1 at 3, 1-3 at 2.) Plaintiff, a former employee, brought causes of action for: (1) Disability discrimination in

violation of California Government Code Section 12940; (2) Age discrimination in violation of Government Code Sections 12940 and 12926(b); (3) Failure to accommodate in violation of Government Code Section 12940(m); and (4) Wrongful termination in violation of public policy. (ECF Nos. 1, 1-3.)  On April 24, 2018, Defendants filed an answer to Plaintiff's complaint in the California Superior Court.  (ECF No. 1 at 3.)  On April 25, 2018, Defendants removed this action to this Court, the United States District Court for the Eastern District of California, claiming the action is proper for removal due to the diversity of citizenship between Plaintiff and Defendants. (ECF No. 1.)

On March 29, 2019, Defendants filed a motion for summary judgment or partial summary judgment against Plaintiff.  (ECF No. 17.)  On April 2, 2019, the Court issued a minute order continuing the hearing on the motion from April 26, 2019, until May 1, 2019 at 2:00 p.m. in Courtroom 9.  On April 17, 2019, Plaintiff filed an opposition to Defendants' motion for summary judgment.  (ECF No. 21.)

On April 23, 2019, due the parties' failure to file a joint statement of undisputed facts and to provide the Court with full transcripts of the depositions cited by the parties in their respective briefing, the Court ordered the parties to further meet and confer and provide the Court with a sufficient joint statement of undisputed facts and to file full copies of the full deposition transcripts with the Court.  (ECF No. 22.)  In that order, the Court also continued the hearing on the motion for summary judgment until May 15, 2019 at 10:00 a.m.  (ECF No. 22.)

On May 1, 2019, Defendant filed a reply, along with a joint statement of undisputed facts, as well as Defendants' and Plaintiff's respective separate statements of additional disputed facts.  (ECF No 23.)  On May 15, 2019, the Court heard oral arguments on the motion for summary judgment.  (ECF No. 24.)

## II.

## SUMMARY JUDGMENT LEGAL STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Washington Mut. Inc. v.

U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 322.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

"In judging the evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence," Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citation omitted), and it "must draw all reasonable inferences in favor of the non-moving party, and determine whether a genuine issue of material fact precludes entry of summary judgment," Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (citations omitted).

**III.**

**UNDISPUTED FACTS**

Following submission of separate statements of undisputed and disputed facts, pursuant to the Court's order, the parties filed a joint statement of undisputed facts.  The first set of

undisputed facts are those that Defendants relied upon in their motion, and the second set of facts are those relied upon by Plaintiff in opposition. The parties agree both sets of facts are undisputed for purposes of the joint statement and motion for summary judgment. (ECF No. 23.)

## A. Defendants' Undisputed Material Facts ("DUMF")

DUMF 1. On October 1, 2017, Stoneledge acquired the furniture store where Plaintiff James Mosley ("Mosley") worked from the Tran family. (Mosley Dep. 23:15-25; Decl. of Shirley Jimenez- Robbins ("Jimenez-Robbins") ("Jimenez-Robbins Decl.") ¶ 7.)

DUMF 2. On October 1, 2017, Stoneledge hired Mosley as a Retail Sales Associate to continue working at the furniture store that had been owned by the Tran family. (Jimenez-Robbins Decl., ¶ 7.)

DUMF 3. Defendant Stoneledge Furniture, LLC ("Stoneledge") was Mosley's employer from October 1, 2017, until his termination. (Mosley Dep. 23: 15-25, 28:15-29:19:3; Ex. 2, Pl. Offer Ltr.)

DUMF 4. Mosley worked at the Ashley Furniture Homestore in Visalia that was operated by Stoneledge. (Mosley Dep. 23:15-25, 28:15- 29:19; Ex. 2, Pl. Offer Ltr.)

DUMF 5. Stoneledge is a wholly owned subsidiary of Ashley Global Retail, LLC ("AGR") and both AGR and Defendant Ashley Furniture Industries, Inc. ("AFI") are both wholly owned subsidiaries of the same parent corporation. (Declaration of Danna Szwed ("Szwed Decl.") ¶3.)

DUMF 6. AFI provides certain shared services to Stoneledge including certain limited human resources services such as administrating medical leaves. (Szwed Decl. ¶3.)

DUMF 7. Stoneledge paid Mosley his wages and benefits and taxes. (Jimenez-Robbins Decl. ¶ 2.)

DUMF 8. Stoneledge had the authority to hire and fire, transfer, promote, discipline or discharge Mosley, establish his work schedules, determine his compensation, and supervise his work. (Jimenez-Robbins Decl. ¶ 2.)

DUMF 9. AFI did not pay Mosley his wages and benefits and taxes. (Jimenez-Robbins Decl. ¶ 4.)

1    DUMF 10.    Disputed.

2    DUMF 11.    Disputed.

3    DUMF 12.    Mosley was unable to "stand all the time" due to this condition. (Mosley

4    Dep. 42:11-13; 47:6-11; 7 60:5-12.)

5    DUMF 13.    Mosley provided doctors' notes to Stoneledge stating that he was under

6    "neurological care" and "temporarily disabled" and contained no further explanation of his

7    alleged disability. (Mosley Dep. 46:7-22, 52:4-20; Ex. 3, 11/3/17 Dr. Note; Ex. 5, 15 11/28/17

8    Dr. Note.)

9    DUMF 14.    Mosley never requested any work restrictions or accommodations for his

10   alleged disability during the time he worked his shifts for Stoneledge in October 2017.

11   DUMF 15.    Mosley admits that he "did not have any medical issues that would have

12   affected [his] ability to perform the functions of [his] job while [he was] at the Visalia store."

13   (Mosley Dep. 43:14-44:18.)

14   DUMF 16.    Mosley testified that between October 1st and November 3rd, 2017, he

15   "did perform the [functions of his job] without accommodation. (Mosley Dep. 60:23-61:2.)

16   DUMF 17.    Mosley testified that from October 1st to some point in November he

17   stood during all working hours other than the time he spent on a meal or rest break. (Mosley

18   Dep. 41:5-11.)

19   DUMF 18.    Mosley did not tell anyone at Stoneledge that he was not able to perform

20   his job if he had to stand. (Mosley Dep. 44:5-8, 73:17-21.)

21   DUMF 19.    Disputed.

22   DUMF 20.    Mosley admits that he joked about himself about the way he walked.

23   (Mosley Dep. 64:4-65:7.)

24   DUMF 21.    Mosley testified that Zeus Saavedra ("Saavedra") and some of the

25   salespeople used to joke about the way he walked, but that he never took it as a mean action and

26   he felt like they were joking with him and not at him. (Mosley Dep. 64:4 – 65:7.)

27   DUMF 22.    Mosley admits that he was friends with everyone at the Visalia store and

28   they all got along very well. (Mosley Dep. 64:10-14.)

DUMF 23.     Mosley had asked to work part-time when he started working for the Trans, but they did not have part-time employees, so he worked full-time until he spent some time at the hospital, after which Mr. Tran offered him a part-time position.  (Mosley Dep. 20:16-24, 26:20–27 27:13.)

DUMF 24.     When Stoneledge hired Mosley, he wanted to continue to work part-time because it was more convenient for him and, although he felt that he was physically capable of working full-time, he did not want to because it would have been much harder physically.  (Mosley Dep. 26:1-3; 26:8-17, 32:9-16.)

DUMF 25.     Stoneledge granted a request by Mosley's manager Zeus Saavedra ("Saavedra") that Mosley be allowed to continue working part-time.  (Mosley Dep. 27:23-28:1; 31:5-16 17;32:1-8.)

DUMF 26.     Mosley was the only salesperson at the Visalia store who was allowed by Stoneledge to work part-time.  (Mosley Dep. 28:2-9; Jimenez-Robbins Dep. 28:13-21, 29:8-19.)

DUMF 27.     Mosley testified that he could work full-time – five days per week.  (Mosley Dep. 32:1-16.)

DUMF 28.     Mosley worked for Stoneledge for a total of 12 days in the month of October 2017 between October 1, 2017 and October 31, 2017.  The last day Mosley reported for work at Stoneledge was October 31, 2017.  (Jimenez-Robbins Decl. ¶ 8, Ex. 1, Mosley Time Records.)

DUMF 29.     Mosley was absent from work from November 3, 2017, until his termination.  (Mosley Dep. 54:2-18, Ex. 6, 12/14/17 Letter to Mosley.)

DUMF 30.     Mosley provided a November 3 doctor's note stating that he was under the neurological care of a doctor and that he was "temporarily disabled" until December 1, 2017.  (Mosley Dep. 46:7-22, Ex. 3, 11/3/17 Dr. Note.)

DUMF 31.     On November 27, 2017, Liza Cuenca sent Mosley a letter notifying him that he was not eligible for leave under the FMLA or the company's personal medical leave and directing him to contact his area's Human Resources Representative.  (Mosley Dep. 50:13-52:3, Ex. 4, 11/27/17 Letter to Mosley.)

DUMF 32.    On November 28, Mosley provided Stoneledge with a doctor's note stating that he was "temporarily disabled" until January 2, 2018.  (Mosley Dep. 52:4-53:5, Ex. 5, 11/28/17 Dr. Note.)

DUMF 33.    Saavedra forwarded Mosley's November 28 doctor's note to Shirley Jimenez-Robbins ("Jimenez-Robbins"), Senior Human Resources Manager at Stoneledge. (Jimenez-Robbins Dep. 33:8-34:10, Ex. 7, November 29, 2017 email; Saavedra Dep. 28:22-29:23.)

DUMF 34.    On December 4, 2018, Saavedra sent an email to Jimenez-Robbins inquiring about Mosley's status because "it seems he won't be able to return for another while if at all." (Ex. 8, 12/4/17 email chain between Saavedra, Jimenez-Robbins, and Barrera; Jimenez-Robbins Dep. 42:11-43:6.)

DUMF 35.    On December 4, 2018, Jimenez-Robbins responded to Saavedra's email stating that Stoneledge needed to send Mosley a notification letter and let Mosley know that Stoneledge would assume a voluntary termination if Mosley did not return to work, but stated that Stoneledge first had to "go through process [sic] before terminating [him]."  (Ex. 8, 12/4/17 email chain between Saavedra, Jimenez-Robbins, and Barrera; Jimenez-Robbins Dep. 23 43:7-17, 43:24-44:8.)

DUMF 36.    By "process" in her December 4, 2018 e-mail response to Saavedra, Jimenez-Robbins meant the "interactive process." (Jimenez-Robbins Dep. 43:7-17, 43:24-44:8.)

DUMF 37.    When Stoneledge's HR representative Denny Barrera called Mosley about his absence from work, Mosley told Barrera he did not know when he would be able to return to work. (Mosley Dep. 56:22-57:4.)

DUMF 38.    Mosley testified that on November 28, 2017, neither he nor his doctor knew when he would be able to return to work.  (Mosley Dep. 52:23-53:5.)

DUMF 39.    Mosley did not ask Barrera for any type of reasonable accommodations during their phone call.  (Mosley Dep. 56:18-21.)

DUMF 40.    Following Barrera's conversation with Mosley, Barrera reported to Jimenez-Robbins that Mosley did not know when he would be able to work.  (Jimenez-Robbins

Decl. ¶ 9)

DUMF 41.     Disputed.

DUMF 42.     On December 14, 2017, Stoneledge notified Mosley by letter that his employment was being terminated.  (Mosley Dep. 54:2-18; Ex. 6, 12/14/17 letter to Mosley.)

DUMF 43.     Prior to December 23, 2017, it was unknown whether Mosley had stenosis or whether he would be able to return to work.  (Mosley Dep. 53:12 – 54:1.)

DUMF 44.     Mosley's doctor released him to work on December 23, 2017, and told Mosley he could do whatever he could tolerate.  (Mosley Dep. 53:12-53:17.)

DUMF 45.     Stoneledge told Mosley he was free to reapply when he was able to return to work.  (Mosley Dep. 54:2-18; Ex. 6, 12/14/17 Letter to Mosley.)

DUMF 46.     Mosley did not reapply for his position after his termination.  (Jimenez-Robbins Decl. ¶ 11.)

DUMF 47.     At the time of his hiring by Stoneledge, Mosley was 77 years old. (Mosley Dep. 25:12-23.)

DUMF 48     Mosley testified that he did not feel like anyone made a negative comment to him about his age in a disparaging way.  (Mosley Dep. 68:13-15.)

DUMF 49.     Mosley made  jokes about his age.  (Mosley Dep. 68:8-9.)

DUMF 50.     Mosley testified that people called him "old man" but  that he did not feel it was derogatory and that he felt people were joking along with him.  (Mosley Dep. 67:17 – 68:15.)

DUMF 51.     Mosley testified that his claim for wrongful termination in violation of public policy is based on the same facts as his disability and age discrimination claims and failure to accommodate claim.  (Mosley Dep. 74:2-75:24.)

## A.     Plaintiff's Undisputed Material Facts ("PUMF")

PUMF 1.     At the time of Stoneledge's acquisition of the Visalia location from the Tran family in October 2017 (Jimenez-Robbins Decl. ¶ 7)[1]

---

[1]  The Court notes this appears to be mistakenly cut off as PUMF 1 and PUMF 2 should be combined.

PUMF 2.     Mr. Mosley was the only part-time Retail Sales Associate, and continued to work for Stoneledge part-time.  (Migliazzo Decl. ¶ 3, Exh. 2, Jimenez-Robbins Dep. 28:15-29:18.)

PUMF 3.     Zeus Saavedra was Mr. Mosley's direct supervisor both before and after the transition.  (Migliazzo Decl. ¶ 5, Exh. 4, Saavedra Dep. 17:10-16.)

PUMF 4.     Mr. Saavedra wanted to keep Mr. Mosley as a part-timer because "he is great", "everybody loves him," and "he puts up great numbers."  (Id., at 20:16-21:21.)

PUMF 5.     Mr. Saavedra confirmed Mr. Mosley performed well until he took a leave of absence.  (Id. at p. 22:1-16.)  He had no issues with Mr. Mosley's performance.  (Id. at 17:17-19.)

PUMF 6.     Mr. Saavedra confirmed Mr. Mosley performed well until he took a leave of absence.  (Id. at p. 22:1-16.)  He had no issues with Mr. Mosley's performance.  (Id. at 17:17-19.)[2]

PUMF 7.     Shirley Jimenez-Robbins is the Senior Human Resources Manager. (Migliazzo Decl., Exh. 2, Jimenez-Robbins Dep. 13:4-11)

PUMF 8.     Ms. Jimenez-Robbins made the ultimate decision to terminate Mr. Mosley. (Id. at p. 57:17-22.)

PUMF 9.     No other personnel made a recommendation with respect to the termination decision.  (Ibid.)

PUMF 10.     Ms. Jimenez-Robbins was not aware of any performance issues. (Id. at 71:2-6.)

PUMF 11.     Ms. Jimenez-Robbins had a role in making sure employees were transitioned to Stoneledge.  (Migliazzo Decl., Exh. 2, Jimenez-Robbins Dep. 19:20-20:2.)

PUMF 12.     In October 2017, Stoneledge took over ownership from Trans. (Jimenez-Robbins Decl. ¶ 7.)

PUMF 13.     Employees were simply "transitioned" to Stoneledge.  (Migliazzo Decl.,

---

[2] The Court notes this is a duplicate of PUMF 5.

Exh. 2, Jimenez-Robbins Dep. 21:15-25.)

PUMF 14. No Retail Sales Associates were interviewed for the job. (Id. at 24:4-12.)

PUMF 15. All Retail Sales Associates at the Visalia location applied for the job, and packages were sent to HR subject to a normal background check and drug test. (Id., at 23:3-23:16.)

PUMF 16. There were no job postings for the positions and advertisements for positions at the time of the acquisition. (Id., at 26:6-16.)

PUMF 17. Mr. Saavedra testified everyone would be retained as part of the transition. (Migliazzo Decl., Exh. 4: Saavedra Dep. 17:20-19:4.)

PUMF 18. The doctor was running tests to determine the cause of Mr. Mosley's leg problems. (Migliazzo Decl., Exh. 1, Mosley Dep. 47:1-21.)

PUMF 19. The company acknowledges a leave of absence to allow Mr. Mosley to recover beyond protected leave can be a form of a reasonable accommodation. (Migliazzo Decl., Exh. 2: Jimenez-Robbins Dep. 67:19- 68:8.)

PUMF 20. Mr. Mosley followed the rules and did not fail to follow company policy with respect to his requests for medical leave. (Id., at 70:2-9; 71:18-23.)

PUMF 21. Following receipt of the November 29, 2017 letter stating Mr. Mosley was "temporarily disabled" until January 2, 2018, Shirley Jimenez-Robbins testified that "I would need clarification as to his return date, if and when he was going to be able to return to work." (Migliazzo Decl., Exh. 2, Jimenez-Robbins Dep. 45:3-23.)

PUMF 22. Denny Barrera was a HR Generalist for Stoneledge. (Migliazzo Decl. ¶ 4, Exh. 3, Barrera Dep. 11:1-19)

PUMF 23. In response to the Mr. Barerra's email circulating the ADA questionnaire, Ms. Jiminez wrote "Miscommunication but not ADA", and suggested that Mr. Barrera talk to Mr. Mosley because "sometimes they rather quit then [sic] go through that process." (Migliazzo Decl., Exh. 9; Migliazzo Decl., Exh. 2, Jimenez-Robbins Dep. 51:8-52:19, Exh. 11.)

PUMF 24. Mr. Barrera subsequently asked Mr. Mosley if he would resign. (Migliazzo Decl., Exh. 3, Barrera Dep. 31:3-12.)

1    PUMF 25.    Mr. Mosley then told Mr. Barrera he would not resign.  (Migliazzo Decl.,

2    Exh. 4, Barrera Dep. 18:17-19:3.)

3    PUMF 26.    Aside from conversations with Zeus Saavedra when Mr. Mosley submitted

4    the two doctor's notes and any telephone conversations Mr. Mosley had with Mr. Barrera, the

5    company did not ask Mr. Mosley for more information related to his absence from work.

6    (Mosley Decl. ¶ 6.)

7    PUMF 27.    Mr. Mosley was never asked to provide clarification from his doctor, nor

8    was he asked about what further information was needed to assist the company in determining

9    how it could accommodate Mr. Mosley upon his return to work on January 2, 2018.  (Ibid.)

10   PUMF 28.    Mr. Mosley was 78 years old at the time of the termination.  (Mosley

11   Decl. ¶ 8.)

12   PUMF 29.    Ms. Jimenez-Robbins made the decision to terminate.  (Migliazzo Decl.,

13   Exh. 2, Jimenez-Robbins Dep. 57:17-22.)

14   PUMF 30.    Mr. Barrera called Mr. Mosley to see if he would "resign" because his

15   leave was not protected, and called Mr. Mosley to see if he could return to work in any capacity

16   "at this time."  (Migliazzo Decl., Exh. 3, Barrera Dep. 14:24-16:1.)

17   PUMF 31.    Ms. Jimenez-Robbins testified she made a determination based on an

18   email from Mr. Mosley's direct supervisor (Saavedra) and a conversation between Mr. Barrera

19   and Mr. Mosley.  (Id. at p. 63:14-19.)

20   PUMF 32.    On December 4, 2017, Saavedra sent an email to HR indicating he did not

21   know when Mr. Mosley would come back, "if at all."  (Migliazzo Decl., Exh. 6; Jimenez-

22   Robbins Dep. 38:7-21, 40:9-22, Exh. 4)

23   PUMF 33.    Ms. Jimenez-Robbins does not know what was said between Mr. Mosley

24   and Mr. Saavedra, nor did she talk to Mr. Saavedra about what Mr. Mosley told Mr. Saavedra

25   about his health.  (Migliazzo Decl., Exh. 2, Jimenez-Robbins Dep. 43:24-44:19.)

26   PUMF 34.    Mr. Saavedra confirmed no one followed up with him about whether Mr.

27   Mosley could return to work.  (Migliazzo Decl., Exh. 4, Saavedra Dep. 31:25-32:5.)

28   PUMF 35.    Mr. Mosley explained to Mr. Barrera he was under the care of his doctor

and he was going to see his doctor again.  (Id. at 16:5-16; Mosley Decl. ¶ 3.)

PUMF 36.     The company did not seek further clarification from Mr. Mosley's doctor about when he could return to work.  (Migliazzo Decl., Exh. 2, Jimenez-Robbins Dep. 68:22-69:16.)

PUMF 37.     Mr. Barrera did not ask Mr. Mosley for more specific information about his disability, nor did he seek any information from Mr. Mosley's doctor.  (Id. at 28:1-29:8.)

PUMF 38.     Nor did Ms. Jimenez-Robbins, as the decisionmaker, talk to Mr. Mosley about his alleged disability or when he would be able to return to work.  (Mosley Decl. ¶ 8.)

PUMF 39.     Stoneledge did not analyze the impact of simply leaving Mr. Mosley's position open until January 2, 2018, nor was the "cost" of keeping the position open for Mr. Mosley part of the company's analysis in deciding to terminate Mr. Mosley 19 days before the January 2, 2018 date stated in his doctor's note of November 29, 2017:

> "Q. Did the company do anything to analyze the impact it would have on the Visalia store if you left that position open for Mr. Mosley until January 2nd, 2018?  A. No."

(Migliazzo Decl., Exh. 2, Jimenez Dep. 63:20-25, 63:25-64:12.)

PUMF 40.     Mr. Barrera confirmed Stoneledge did not consider the "hardship" of keeping the position open to Mr. Mosley for two more weeks.  (Migliazzo Decl., Exh. 3, Barrera Dep. 21:5-22:4, 31:13-16.)

PUMF 41.     In fact, the company was able to cope without Mr. Mosley being present during the November 2017 timeframe.  (Migliazzo Decl., Exh. 4, Saavedra Dep. 26:9-24.)

PUMF 42.     Mr. Saavedra was promoted to Visalia store manager on October 8, 2014.  (Migliazzo Decl., Exh. 4, Saavedra Dep. 17:3-13.)  Mr. Saavedra was involved in the hiring of Retail Sales Associates after Mr. Mosley was terminated.  (Id. at 38:11-18.)

PUMF 43.     Within a couple months of Mr. Mosley's termination, Stoneledge hired a "young lady" named Allison and Larry as a Retail Sales Associates.  (Migliazzo Decl., Exh. 4, Saavedra Dep. 38:11-39:18.)  Mr. Saavedra estimates Allison is in her early 20's.  (Id. at 40:1-3.)  Larry is in his 50's or 60's.  (Id. at 40:4-5.)

PUMF 44.     Other Retail Sales Associates at the time of Mr. Mosley's termination

1  included Pat Hagler, Teresa Hagler, Mary Romero, Adrian Hill, Michele Kiner, Johanna Orijel,

2  Karla Lopez, Ally Shandrew, Eric (Last name unknown), Julie (last name unknown), Norma

3  Guzman, Natalie Juarez, and Angelique Toscano (Saavedra Dep. 36:24-37:21; 44:3-7 (Juarez);

4  44:13-45:1 (Toscano))

5        PUMF 45.    Zues Saavedra testified as follows regarding his belief of the ages of sales

6  associates Stoneledge retained or hired following its acquisition of the Vislia store in October

7  2017:

8      -    Adrian Hill in his late 20's (Migliazzo Decl., Exh. 5, Saavedra Dep. 41:7-8)

9      -    Michele Kinner (sic) in late 20's or early 30's (Saavedra Dep. 41:5-6)

10      -    Johanna Orijel probably in her 30's (Saavedra Dep. 40:18-20)

11      -    Karla Lopez in her 20's (Saavedra Dep. 40:16-17);

12      -    Andrew (sic) (possibly Shandrew) in her 20s (Saavedra Dep.40:14-15)

13      -    Eric (last name unknown) is his 20's (Saavedra Dep. 40:12-13)

14      -    Norma Guzman in her 20's (Saavedra Dep. 40:8-9)

15      -    Natalie Juarez in her late 20's or early 30's (Saavedra Dep. 44:3-12)

16      -    Angelique Toscano is in her Mid-20's to late 20's (Saavedra Dep. 45:5-7);

17      -    Allison is in her early 20's (Saavedra Dep. 40:1-3)

18      -    Pat Hagler in his 50's (Saavedra Dep. 41:13-14.)

19      -    Teresa Hagler in her late 40's (Saavedra Dep. 41:11-12.)

20      -    Mary Romero in her 50's or 60's (Saavedra Dep. 41:9-10)

21      -    Julie (last name unknown) in her 50's (Saavedra Dep. 40:10-11);

22      -    Jan Barnes is in his mid- 60's (Saavedra Dep. 40:6-7); and

23      -    Larry is in his 50's or 60's (Saavedra Dep. 40:4-5).

24  **C.**    **The Parties' Separate Statements of Disputed Facts**

25        The parties also have submitted separate statements of additional disputed facts where the

26  parties have proffered additional facts and have responded to the other's statements indicating

27  why they believe the fact to be in dispute. (See ECF Nos. 23-2, 23-3.) If necessary to the

28  adjudication of the motion, the Court will examine these additional facts and determine if any

can be considered undisputed based on the parties' proffers and incorporate into the discussion and analysis further below in this opinion. Throughout the below opinion, Plaintiff's additional facts shall be designated with the acronym "PADF" while Defendants' shall be designated "DADF."

# IV.

## DISCUSSION AND ANALYSIS

Defendants raise six primary arguments in their motion for summary judgment: A) Plaintiff's disability discrimination claim fails; B) Plaintiff's failure to accommodate claim fails; C) Plaintiff's age discrimination claim fails; D) Plaintiff's claim for wrongful termination in violation of public policy fails; E) Plaintiff's claims against Defendant AFI should be dismissed because AFI was not Plaintiff's employer; and F) Plaintiff's claim for punitive damages fails. The Court addresses each of Defendants' arguments in turn as they were presented in Defendants' motion.

### A. Plaintiff's Disability Discrimination Claim

   1.   Defendants Argue Plaintiff's Disability Discrimination Claim Fails to the Extent it is Based on a Requirement to Stand on the Sales Floor during October 2017

Defendants argue Plaintiff cannot prove a prima facie case that he was discriminated based on a disability to the extent such claim is based on the allegation that he was required to stand during the shifts that Plaintiff worked during October of 2017. (Def.'s Mem. P. & A. Supp. Mot. Summ. J. ("Mot.") 16, ECF No. 17-1.)

Discrimination claims under FEHA relating to disparate treatment are analyzed under the three-step burden-shifting framework established by the U.S. Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). See Lawler v. Montblanc N. Am., LLC, 704 F.3d 1235, 1242 (9th Cir. 2013); Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 353 (2000). Under this framework, at the trial stage, the plaintiff has the initial burden of establishing a prima facie case of discrimination. Lawler, 704 F.3d at 1242. However, this burden-shifting framework is reversed where, as here, an employer defendant moves for summary judgment. Id.; Arteaga v. Brink's, Inc., 163 Cal.App.4th 327, 344 (2008). For purposes of this motion, Defendants bear

the initial burden of showing that either: 1) Plaintiff cannot establish one of the elements of the FEHA claim; or 2) there was a legitimate, nondiscriminatory reason for the decision to terminate Plaintiff's employment. See Lawler, 704 F.3d at 1242. If Defendants meet this initial burden, Plaintiff must then demonstrate that either: 1) Defendants' showing was insufficient; or 2) that there was a triable issue of fact material to the Defendants' showing. Id.

The parties agree Sandell describes the correct standard applicable to establish a prima facie case of disability discrimination, which requires a showing that Plaintiff: "(1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations; and (3) was subjected to an adverse employment action because of the disability or perceived disability." Sandell v. Taylor-Listug, Inc., 188 Cal.App.4th 297, 310 (2010); see also Holtzclaw v. Certainteed Corp., 795 F. Supp. 2d 996, 1015 (E.D. Cal. 2011). The Court now turns to the question of whether Plaintiff had a disability during the relevant time period.

### a. Whether Plaintiff had a Disability

Defendants argue that Plaintiff cannot prove the first element of the prima facie claim that he had a disability during October of 2017 because Plaintiff testified that his alleged disability was "a problem with his legs," that he had no other disability, and explained that the problem with his legs later turned out to be nerve damage and that it caused him to not being able to "stand all the time." (Mot. 16-17; DUMF 11, 12.)[3] Defendants argue that while standing is a major life activity under FEHA, standing all of the time is not, given nobody can stand all of the time, and thus an occasional need to sit down is not a limitation on a major life activity, but rather a major life activity itself. (Mot. 17.) Defendants emphasize that in McDonald, the Ninth Circuit held that even use of the walking cane, by itself, does not establish that a "major life

---

[3] DUMF 11 is disputed by Plaintiff. DUMF 11 states that "Mosley's only alleged disability was a 'problem with his legs' of 'nerve damage,'" (Mosley Dep. 42:11-13; 47:6-11; 60:5-12). Plaintiff disputes this fact by arguing that: "Mr. Mosley believed, at the time he took protected leave in November 2017, that the problems with his legs came from spinal stenosis from a surgery he had in July 2017," (Mosley Decl. ¶ 2; Schwan Decl., Ex. 9; Mosley Dep. 42:14-19). (ECF No. 23-3, at 4.) Defendants respond that DUMF 11 is supported by Plaintiff's deposition testimony, and the dispute raised by Plaintiff does not actually dispute the fact as the underlying medical cause of the problem is irrelevant and immaterial. (ECF No. 23-3, at 4.) As shown below, this particular dispute does not impact the Court's determination as to the question of whether Plaintiff was disabled under FEHA.

activity" was limited.  <u>McDonald</u> 543 F.3d 498, 505 n.6 (9th Cir. 2008).  Defendants further highlight Plaintiff testified that during October of 2017, he did not need any accommodations for his alleged disability (DUMF 15, 18), could perform his job duties without an accommodation (DUMF 16, 17), and never requested any accommodations, modifications, or restrictions (DUMF 14).

Plaintiff responds that this element and element three of the prima facie disability claim are not in issue because Plaintiff "was terminated for no other reason except his disability." (Pl.'s Mem. P. & A. Opp'n. Def.'s Mot. Summ. J. ("Opp'n") 24, ECF No. 21-1.)  Plaintiff directs the Court to Exhibit 10, which is the December 14, 2017 letter from Shirley Jimenez-Robbins (hereinafter "Jimenez-Robbins"), identified as the Sr. Human Resources Manager for Stoneledge Furniture, and typed on Ashley Homestore letterhead.  In relevant part, the letter states that:

> As you know, you have been absent from work since 11/03/2017.  Under Company policy and applicable federal and state law, you did not qualify for a Personal Medical Leave or Family Medical Leave of Absence.  As such, your absences since 11/03/2017 have been unexcused.
>
> As a result of the above and because there is no means of facilitating your return to work, with or without reasonable accommodation, we must regrettably terminate your employment effective 12/15/2017 . . .
>
> . . . When you are able to return to work and should you be interested in future employment with Stoneledge Furniture LLC (Ashley HomeStore), please feel free to reapply.

(ECF No. 21-5, at 136.)  The Court doesn't believe the issue is quite as clear as Plaintiff contends, and it appears Plaintiff does not address the fact that Defendant is making their argument to the specific time period of October of 2017 prior to the adverse employment action of termination.  As conceded at the hearing, despite the complaint encompassing certain policies regarding standing, and potential discriminatory comments during this earlier period in October of 2017, discovery has narrowed the focus of the issues underlying the claim to Plaintiff's leave of absence following his doctor's temporary disability note, and the termination that followed.

The undisputed facts put forth circumstances which, as explained below, appear to satisfy the liberal policies underlying the California statutes pertaining to whether an employee is

disabled. Plaintiff provided doctors' notes to Stoneledge stating that he was under "neurological care" and "temporarily disabled," and specifically provided a November 3, 2019 doctor's note stating that he was under the neurological care of a doctor and that he was "temporarily disabled" until December 1, 2017. (DUMF 13, 30.) The doctor was running tests to determine the cause of Plaintiff's leg problems. (PUMF 18.) On November 28, Plaintiff provided Stoneledge with a doctor's note stating that he was "temporarily disabled" until January 2, 2018. (DUMF 32.) On December 14, 2017, Stoneledge notified Plaintiff by letter that his employment was being terminated. (DUMF 42.) Plaintiff's doctor released him to work on December 23, 2017, and told him he could do whatever he could tolerate. (DUMF 44.)

As noted in Sandell, the California "Legislature has made it clear that FEHA's statutory provisions are to be interpreted broadly," that FEHA contains broad definitions of disability with the intent that such definitions "be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling," and that the provisions of FEHA must be construed liberally for the accomplishment of its purposes. Sandell, 188 Cal.App.4th at 310.

Under the statute, physical disability includes, but is not limited to, any physiological disease, disorder, or condition that both: A) affects a body system, including neurological and musculoskeletal systems; and B) limits a major life activity. Cal. Gov't Code § 12926(m)(1)(A)-(B). "Major life activities" is to be "broadly construed and includes physical, mental, and social activities and working, Cal. Gov't Code § 12926(m)(1)(B)(iii), and it is clear that standing is a major life activity under this broad definition. Cal. Code Regs. tit. 2, § 11065 ("Major life activities include, but are not limited to . . . standing"). A condition "limits a major life activity if it makes the achievement of the major life activity difficult." Cal. Gov't Code § 12926(m)(1)(B)(ii). The California Supreme Court has emphasized that in using the term "limits," the California Legislature expressly did not intend for the statute to utilize the stricter federal standard of "substantial limitation." See Colmenares v. Braemar Country Club, Inc., 29 Cal.4th 1019, 1030–31 (2003). Further, for purposes of the statute, physical disability also

includes "[b]eing regarded or treated by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult." Cal. Gov't Code § 12926(m)(4). And again, the FEHA was intended to protect employees from discrimination "due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling." Sandell, 188 Cal.App.4th at 310 (emphasis added).

It is undisputed that Plaintiff provided Stoneledge with a November 3, 2019 doctor's note stating that he was "temporarily disabled" until December 1, 2017, and then on November 28, Mosley provided Stoneledge with another doctor's note stating that he was "temporarily disabled" until January 2, 2018. (DUMF 13, 30, 32.) Taking these facts together with the liberal interpretive policies regarding disabilities under California law, and viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that Plaintiff's condition constitutes a disability. However, first evidence of plaintiff's disability is the doctor's note dated November 3, 2017, and thus Plaintiff cannot establish, based on the record before the Court, that he was disabled prior to this date.[4]

The Court notes that in McDonald, cited by Defendants, the Ninth Circuit stated that McDonald, who had "assert[ed] disability by virtue of her use of a walking cane," did not produce any evidence of being disabled under the meaning of the Unruh Act which requires a condition that both affects a body system and limits a major activity, and given the "only evidence of disability presented by McDonald [was] that she uses a cane," such fact alone did not establish a major life activity had been limited, and more particularized evidence was required. McDonald 543 F.3d at 505 n.6. Here, the undisputed facts demonstrate that Plaintiff's doctor opined that he was temporarily disabled, that the employer knew about this determination from the doctor, that the doctor was conducting further tests to determine the cause of the condition, and Plaintiff has connected this condition with limitations on the major life activities of standing and working. This goes beyond the facts in McDonald where the Plaintiff simply

---

[4] As noted above, and described in greater detail below, the evidence concerning the scope of the disability claim is more narrowly focused than the claims contained in the complaint, and the disability claim no longer appears to encompass the alleged discrimination in October of 2017, or the store's alleged standing policy in October of 2017.

presented the fact that she utilized an assistive device, without connecting such fact to a physiological condition, and then connecting that condition to a particularized limitation on a major life activity.

Thus, there is sufficient evidence in the record before the Court to demonstrate to a jury that Plaintiff was limited in his ability to stand and work—major life activities—and, therefore, that he suffered from a disability beginning on November 3, 2017, the date of the first doctor's note provided to the employer, and through to the time his employment was terminated. However, Plaintiff was not disabled prior to this date. Given this, the Court agrees with Defendants that, to the extent Plaintiff's disability discrimination claim is based on a policy requiring him to stand on the sales floor during October of 2017, Plaintiff's disability discrimination fails. However, to the extent Plaintiff's claim is based on being disabled after November 3, 2017, Plaintiff has met this element of the prima facie case. The Court now turns to the question of whether there was an adverse employment action during the relevant time period.

**b. Adverse Employment Action**

Defendants argue that even if Plaintiff could demonstrate that he suffered from a disability during October of 2017, he cannot establish an adverse employment action due to disability occurred prior to going on leave in November of 2017. (Mot. 17.) Again, Plaintiff argues this element of the prima facie case is not in issue because Plaintiff "was terminated for no other reason except his disability," and thus Plaintiff does not appear to address Defendant's time specific argument that no adverse employment action took place before November of 2017. (Opp'n 24.)

Under FEHA, an "adverse employment action" must materially affect the terms, conditions, or privileges of employment. Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028, 1050–52 (2005). The California Supreme Court has instructed courts to interpret the phrase "terms, conditions, or privileges of employment" liberally "and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." Id. at

1054.  However, "changes in terms and conditions of employment must be both substantial and detrimental to be actionable."  Waterbury v. United Parcel Serv., No. 2:12-1911 WBS CKD, 2014 WL 325326, at *5 (E.D. Cal. Jan. 28, 2014) (quoting Horsford v. Bd. of Trs. Of Cal. State Univ., 132 Cal.App.4th 359, 373 (2005)).

It is undisputed that Plaintiff "never requested any work restrictions or accommodations for his alleged disability during the time he worked his shifts for Stoneledge in October 2017," that he "did not have any medical issues that would have affected [his] ability to perform the functions of [his] job while [he was] at the Visalia store," that "between October 1st and November 3rd, 2017, he "did perform the [functions of his job] without accommodation," "that from October 1st to some point in November he stood during all working hours other than the time he spent on a meal or rest break," and that "did not tell anyone at Stoneledge that he was not able to perform his job if he had to stand."  (DUMF 14, 15, 16, 17, 18.)

As the Court found in the previous section, Plaintiff cannot establish he suffered from a disability prior to November 3, 2017, and thus agrees with Defendants that Plaintiff cannot establish an adverse employment action occurred in relation to his disability prior to his leave in November of 2017.  The Court notes that in the complaint, Plaintiff alleges that on or around June of 2017, he began having difficulty standing and walking for long periods of time, underwent surgery, and then upon returning to work, was able to perform his job duties because salesmen were allowed to sit unless they had a customer.  (ECF No. 1-3 at 3.)  The complaint then alleges that on or around October 1, 2017, Defendants changed a policy with regard to allowing salesmen to sit when they did not have a customer, and shortly thereafter, Plaintiff began having difficulty standing and walking during his eight hour shifts as a result of the medical condition.  Plaintiff alleges he informed the store manager about this, and the manager informed Plaintiff that it was store policy, and also alleges the manager mocked his gait at this point.  (ECF No. 1-3 at 3-4.)

Despite these contentions in the complaint, the Court cannot discern any argument, nor any disputed or undisputed facts put forth by Plaintiff in his briefing to address Defendants' argument that that there was no adverse employment action prior to November of 2017.  On

summary judgment, each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). For this reason, and because the Court previously established that Plaintiff was not considered disabled until he submitted the doctor's note to the employer, the Court finds Plaintiff has failed to put forth a prima facie case of disability discrimination to the extent that the claim is based on an adverse employment action that occurred other than Plaintiff's termination of employment.

However, it is undisputed that on December 14, 2017, Stoneledge notified Plaintiff that his employment was being terminated. (DUMF 42.) Thus, Plaintiff's disability discrimination claim may move forward to the extent it is based on his disabled status after November 3, 2017, and based on the adverse employment action of termination in December of 2017. In sum, an issue of material fact exists here in determining whether the Plaintiff was in fact terminated due to his disability.

### c. Whether a Policy Requiring Employees to Stand on the Sales Floor was a Pretext for Disability Discrimination

Defendants argue that even if the prima facie elements were satisfied as to the October 2017 time period, Plaintiff cannot show that if Stoneledge did require salespersons to stand on the floor, this was a pretext for disability discrimination. To the extent Stoneldge did require salespersons to stand, Defendants emphasize that it was a policy that applied uniformly to the sales staff, and there is no evidence demonstrating Plaintiff was singled out, and Plaintiff admitted that he did not inform the company of any inability to stand and did not ask for an accommodation in this regard. (Mot. 18.)

As the Court found above, Plaintiff has not established that he was disabled prior to November 3, 2017, nor that an adverse employment action took place during October of 2017 or any time prior to the Plaintiff's termination. However, even if there was a policy requiring

Plaintiff to stand in October of 2017, and even if Plaintiff was disabled in October of 2017, the Court finds Defendants have demonstrated there is no evidence of such policy being a pretext for disability discrimination, and Plaintiff has not put forth specific evidence or facts that demonstrate otherwise as to any specific policy requiring Plaintiff to stand.

       2.      Defendants argue Indefinite Leave is not a Reasonable Accommodation and thus Defendants had a Legitimate Basis to Terminate Him

Defendants argue that even if Plaintiff could state a prima facie case of disability discrimination, Stoneledge had a legitimate, non-discriminatory reason for its actions, because FEHA allows employers to terminate employees who are "unable to perform his or her essential job duties . . . even with reasonable accommodations," Cal. Govt. Code § 12940(a)(1), and argue that indefinite leave is not a reasonable accommodation that Defendants are obligated to provide. (Mot. 19.) The Defendants cite various cases in support of this argument, which the Court now turns to for further guidance.

Defendants cite <u>Hanson v. Lucky Stores, Inc.</u>, wherein the court stated a reasonable accommodation "does not require the employer to wait indefinitely for an employee's medical condition to be corrected." 74 Cal.App.4th 215, 226 (1999) (citation omitted). The Court notes that in <u>Hanson</u>, the court simply found that the employer did attempt to reasonably accommodate the employee as the employee was only entitled to nine months of leave under the collective bargaining agreement, and the employer provided sixteen months of leave. The court stated the extra months of leave constituted a reasonable accommodation, and the employer was not required to wait indefinitely for the medical condition to become better. <u>Id.</u> at 227.

Defendants cite <u>Nealy v. City of Santa Monica</u>, 234 Cal.App.4th 359, 377 (2015), for the statement that "FEHA does not require the employer to provide an indefinite leave of absence." However, the Court notes that the <u>Nealy</u> court's full statement reads: "To the extent Nealy claims the City had a duty to await a vacant position to arise, he is incorrect. A finite leave of absence may be a reasonable accommodation to allow an employee time to recover, but FEHA does not require the employer to provide an indefinite leave of absence to await possible future vacancies." <u>Nealy</u>, 234 Cal.App.4th at 377-78. The <u>Nealy</u> court further stated: "In short, an

employer can prevail on summary judgment on a claim of failure to reasonably accommodate by establishing through undisputed facts that there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation." Id. at 378 (internal quotation marks and citation omitted).

Defendants cite McCarthy v. R.J. Reynolds Tobacco Co., 819 F.Supp.2d 923 (E.D. Cal. 2011), for the proposition that "[e]mployers need not retain an employee on the payroll on an indefinite leave of absence when that employee is unable to work." 819 F.Supp.2d at 936 (emphasis added by this Court). The Court notes that this statement from the McCarthy court is based on a citation to Hanson v. Lucky, cited above, and the McCarthy court noted that the Hanson court's holding stated that a finite leave can be a reasonable accommodation, provided at the end of the leave, the employee would be able to perform the duties of the position. In line with this principle, in McCarthy, the employee "admitted that she [was] unable to work and was terminated because she failed to return to work," and it was "clear that no accommodation would allow her to return to perform the essential elements of her job; thus, she was not a 'qualified individual.'" McCarthy, 819 F. Supp. 2d at 936.

Finally, Defendants cite Ruiz v. Paradigmworks Grp., Inc., No. 16-CV-2993-CAB-BGS, 2018 WL 1010475 (S.D. Cal. Feb. 22, 2018), for the holding that an employer is not required to extend a multi-month leave of absence if the employee is totally disabled and cannot provide a definite end date to the leave. The Court notes the holding in Ruiz is dependent on the fact that the employee was totally disabled and would be unable to return to the position even with reasonable accommodations as the Ruiz court notes: "there is no dispute that Ruiz was totally disabled and that no accommodation would have allowed her to perform her job," and the FEHA did not require the employer to extend the medical leave indefinitely until she was able to return to work, and thus she was not a qualified individual. Ruiz, 2018 WL 1010475, at *2, 4 (noting the "frequently stated standard" that an individual is qualified if they can perform the essential functions of a position with or without reasonable accommodation, and it was undisputed she was "unable to perform any of the essential functions of her position, when she was

terminated.").

With this backdrop of case law, here, Defendants rely on the undisputed fact that "[w]hen Stoneledge's HR representative Denny Barrera called [Plaintiff] about his absence from work, [Plaintiff] told Barrera he did not know when he would be able to return to work." (DUMF 37.) Based on this fact, Defendant argues that Plaintiff could not perform his essential job duties because he did not know when or if he was returning to work, and thus the termination was lawful as based on a legitimate and non-discriminatory business reason. (Mot. 19-20.)

Plaintiff argues that Defendants inappropriately mischaracterize his leave as indefinite in order to justify termination, highlighting that Jimenez-Robbins made the decision to terminate (PUMF 8), that Plaintiff was allegedly terminated on the basis Jimenez-Robbins did not know when Mr. Mosley was coming back to work, even though she was in receipt of a doctor's note declaring he was temporarily disabled through January 2, 2018 (Jimenez-Robbins Dep. 57:23-58:1),[5] and that Jimenez-Robbins testified she made the determination based on an email from Plaintiff's direct supervisor (Saavedra) and a conversation between Barrera and Plaintiff (PUMF 31).[6] (Opp'n 11-12.) On December 4, 2017, Saavedra sent an email to HR indicating he did not know when Mr. Mosley would come back, "if at all," (PUMF 32),[7] that Jimenez-Robbins does not know what was said between Plaintiff and Saavedra, nor did Jimenez-Robbins talk to Saavedra about what Plaintiff told Saavedra about his health (PUMF 33), and that Saavedra confirmed no one followed up with him about whether Plaintiff could return to work (PUMF 34). (Opp'n 12.)

Plaintiff argues that instead of allowing until January 2, 2018 to return to work, Barrera

---

[5]  This citation to the deposition transcript is not reflected in any of the disputed or undisputed facts, but upon the Court's review, the statement is supported by the deposition testimony. (See Jimenez-Robbins Dep. 57:23-58:6.)

[6]  Here the deposition reflects the question: "Did the company consider just extending his leave to January 2nd as a reasonable accommodation?" and Jimenez-Robbins answered: "We considered it, but based on the conversation that Denny and even the email from Zeus Saavedra, we didn't believe he was going to be back on January 2nd." (Jimenez-Robbins Dep. 63:14-19.)

[7]  The Court notes that Plaintiff's citation to Exhibit 6 appears to refer to a November email (ECF No. 21-5 at 118), and the December 4, 2017 email is in fact Exhibit 7 (ECF No. 21-5 at 122). The December 2, 2017 email from Saavedra states: "I was wondering what is the next step it seems he won't be able to return for another while if at all, Please advise?" (ECF No. 21-5 at 122.) The deposition citations also refer to the November email chain.

called Plaintiff to see if he would "resign" because Plaintiff's leave was not protected, and to see if Plaintiff could return to work in any capacity "at this time." (PUMF 30.)[8] Plaintiff explained to Barrera he was under the care of his doctor and was going to see his doctor again (PUMF 35),[9] and during this conversation, Barrera gave him the option of "resigning" or be "terminated" because he did not have protected leave (Barrera Dep. 17:4-15),[10] specifically telling Plaintiff he should quit because he has been gone so long and he would be better off if he quit (Mosley Decl. ¶ 4).[11] Plaintiff argues the company did not seek further clarification from Plaintiff's doctor about when he could return to work (PUMF 36),[12] however, Barrera did not ask Plaintiff for more specific information about his disability, nor did he seek any information from Mr. Mosley's doctor (PUMF 37). (Opp'n 12-13.)

As discussed above, the cases cited by Defendants do not support the absolute argument Defendants seem to be putting forth, which appears to be that because a leave of absence is indefinite in some regard, or any regard, a termination based on such leave being indefinite is then a termination based on a legitimate, non-discriminatory purpose. See Hanson v. Lucky

---

[8] The Court notes that in a first telephone conversation that Barrera recalls occurring in late November of 2017, Barrera states Plaintiff said something to the effect of "he didn't know if he'd be able to return to work or when he'll be return to work," and Barrera doesn't recall if he was in receipt of the second doctor's note at this time. (Barrera Dep. 13:2-24.) In the second telephone conversation that Barerra recalls occurring in December of 2017, Barrera states the purpose of the call was to "see if he was going to – for one, to see if his medical status had changed at all. Two, if it didn't; if he was going – if he wanted to resign his position and reapply later or to inform him that we would be terminating his employment. His job wasn't protected." (Barrera Dep. 14:24-15:9.) Barerra also confirmed that the purpose of the call was to determine "if he would be able to return to work in any capacity," and recalls Plaintiff "saying he could not work. He couldn't return to work at this time and wasn't able to work at all." (Barrera Dep. 14:15-16:1.)

[9] The Court notes that here, Barrera recalls Plaintiff stated he was under the care of a doctor, but didn't remember Plaintiff saying he was going to find out more information before being released to go back. (Barrera Dep. 16:5-16.)

[10] This references Plaintiff's additional disputed fact 10. Defendant disputes this fact "only to the extent that Plaintiff purports to know Mr. Barrera' [sic] motivation without any evidence to support this claim, which is immaterial. Defendant does not dispute that Mr. Barrera gave Mosley the choice to resign if he did not want to be terminated. Thus, while this fact is partially disputed, it is not disputed as to any material fact." (ECF No. 23-2.)

[11] This fact is disputed, but not in a material way as Defendant argues it is undisputed "that Barrera offered Plaintiff the opportunity to resign rather than being involuntarily terminated. The dispute is regarding the language used. However, regardless of whether Mr. Mosley's version of the conversation or Mr. Barrera's version is accurate, it is undisputed that the Company offered him the choice between resignation or termination. He chose not to resign." (ECF No. 23-2 at 6-7.)

[12] Here Jimenez-Robbins testifies that they relied on communications directly with Plaintiff. (Jimenez-Robbins Dep. 69:3-8.)

1  Stores, Inc., 74 Cal. App. 4th 215, 226 (1999); Nealy v. City of Santa Monica, 234 Cal. App. 4th

2  359, 377 (2015); McCarthy v. R.J. Reynolds Tobacco Co., 819 F. Supp. 2d 923 (E.D. Cal. 2011);

3  Ruiz v. Paradigmworks Grp., Inc., No. 16-CV-2993-CAB-BGS, 2018 WL 1010475 (S.D. Cal.

4  Feb. 22, 2018).[13]

5      Further, given the interplay of the facts described above, a dispute over whether the leave

6  of absence was indefinite, or at least whether the employer considered or made the determination

7  that it was indefinite in good faith exists in this case.   Of most significance here are the

8  undisputed facts that on November 28, 2017, Plaintiff provided Stoneledge with a doctor's note

9  stating that he was "temporarily disabled" until January 2, 2018, and that "[w]hen Stoneledge's

10  HR representative Denny Barrera called [Plaintiff] about his absence from work, [Plaintiff] told

11  Barrera he did not know when he would be able to return to work."  (DUMF 32, 37.)  On one

12  hand, the Court believes a reasonable jury could find that the doctor's note set a definite period

13  of time of disability while further medical testing was to be completed.   Additionally, a

14  reasonable jury could find that the statements made by Plaintiff in response to the inquiry

15  spearheaded by the employer's agent when the employer knew about the doctor's note setting the

16  period for testing, would not override the definite period stated in the doctor's note, nor

17  necessarily make the period as indefinite as in the cases described above.  Further, additional

18  facts disputed and undisputed, create further analysis appropriate for the province of the jury.

19  Plaintiff explained to Barrera he was under the care of his doctor and was going to see his doctor

20  again (PUMF 35), and during this conversation, Barrera gave Plaintiff the option of "resigning"

21  or be "terminated" because he did not have protected leave (Barrera Dep. 17:4-15),[14] specifically

22  telling Plaintiff he should quit because he has been gone so long and he would be better off if he

23  quit (Mosley Decl. ¶ 4).[15]  The company did not seek further clarification from Plaintiff's doctor

24  _____
     [13]  In the next related section concerning Plaintiff's failure to accommodate claim, Defendants cite one additional

25  case concerning the subject of indefinite leave, Canupp v. Children's Receiving Home of Sacramento, 181 F. Supp.
     3d 767 (E.D. Cal. 2016).  However as explained below, this additional case does not change the Court's opinion

26  regarding this line of cases, particularly given the various factual disputes on this subject that are best left to be
     weighed by a jury.

27  [14]  This references Plaintiff's additional disputed fact No. 10, described above in footnote 10.

28  [15]  This fact is disputed as referenced above in footnote 11.

about when he could return to work (PUMF 36),[16] and Barrera specifically did not ask Plaintiff for more specific information about his disability or from the doctor (PUMF 37).

On the other hand, even without the additional conversation between Plaintiff and Barrera, a reasonable jury could consider the doctor's note itself as indefinite in the regard that it only sets the bare minimum date of the leave while further tests are conducted to determine the cause of the condition, and to determine whether Plaintiff could return at a later date, and in what capacity, a reasonable determination that would be strengthened given Plaintiff's statement to Barrera on the phone, and thus could establish the leave as indefinite. However, as explained above, it appears that the case law shows that there are different levels of indefiniteness as it relates to periods of leave and interplay with the level of disability that creates a fact-specific analysis that the Court finds appropriate for the jury and unsuitable for determination on summary judgment.

Accordingly, for all of the above reasons, the Court rejects Defendants' argument that Plaintiff's leave of absence was indefinite as a matter of law, and also rejects the argument that if the leave was indefinite, it was not a reasonable accommodation and thus a legitimate and non-discriminatory reason for termination. In sum, material issues of fact preclude summary judgment on the issue of whether Plaintiff's leave was indefinite, and whether indefinite leave can be a reasonable accommodation under these circumstances.

**B.    Plaintiff's Failure to Accommodate Claim**

FEHA requires employers to make reasonable accommodation for the known disabilities of employees to enable them to perform a position's essential functions, unless doing so would produce undue hardship to the employer. Cal. Gov't Code § 12940(m). Undue hardship is defined as "an action requiring significant difficulty or expense" in consideration of the following factors:

> (1) The nature and cost of the accommodation needed.
> (2) The overall financial resources of the facilities involved in the provision of the

---

[16]  Here, Jimenez-Robbins testifies that they relied on communications directly with Plaintiff. (Jimenez-Robbins Dep. 69:3-8.)

27

reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.

(3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.

(4) The type of operations, including the composition, structure, and functions of the workforce of the entity.

(5) The geographic separateness or administrative or fiscal relationship of the facility or facilities.

Cal. Gov't Code § 12926(u). Unless the employer can demonstrate, after engaging in the interactive process, that the accommodation would pose an undue hardship, an employer has an affirmative duty to provide such reasonable accommodation where a disability is known to such employer. Prilliman v. United Air Lines, Inc., 53 Cal.App.4th 935, 950-51 (1997). The employer must engage in a "timely, good faith interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n). To prevail on a claim "for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred." Scotch v. Art Inst. of California, 173 Cal.App.4th 986, 1018 (2009).

The burden is on Defendant, as the moving party, to show no triable issue exists on a claim based on failure to accommodate. Jensen v. Wells Fargo Bank, 85 Cal.App.4th 245, 260, (2000). The elements of a failure to accommodate claim are: 1) the plaintiff has a disability or was regarded as suffering a disability; 2) the plaintiff is qualified for the position in that they can perform the essential functions; and 3) the employer failed to reasonably accommodate the employee's disability. Cuiellette v. City of Los Angeles, 194 Cal.App.4th 757, 766 (2011).

Defendants ague that they did not fail to accommodate Plaintiff by requiring him to stand on the sales floor during October of 2017. As the Court noted above, Plaintiff's complaint made allegations regarding a change in store policy around October 1, 2017, which required Plaintiff to stand even when he did not have a customer, and shortly thereafter, Plaintiff began experiencing difficulty standing, and made the employer aware of this. (ECF No. 1-3 at 3-4.) However, as the

Court held above, Plaintiff failed to put forth a prima facie case to the extent that the claim is based on being disabled in October of 2017, based on an adverse employment action that occurred other than Plaintiff's termination, or to the extent that the claim is based on a policy requiring Plaintiff to stand on the sales floor during October of 2017. The Court thus granted Defendants' motion for summary judgment to the extent Plaintiff's disability discrimination claim was based on such policy or based on an adverse employment action other than the termination. In line with that holding, the Court agrees with Defendants that they did not fail to accommodate Plaintiff by requiring him to stand on the sales floor during October of 2017.

However, as the Court found above, there is sufficient evidence in the record before the Court to demonstrate to a jury that Plaintiff was disabled as of the date of the first doctor's note, November 3, 2017, and thus has met the first element of the prima facie case for his failure to accommodate claim.[17] In addition, the Court finds there is sufficient evidence to demonstrate to a jury that Plaintiff has met the second element of the prima facie case in that he is qualified for the position and can perform the essential functions of the job. Thus, the Court turns to the question of whether Defendants failed to reasonably accommodate Plaintiff's disability when they terminated him instead of waiting until the end of his period of temporary disability established by Plaintiff's doctor's note. As the Court found in the previous subsection in relation to the disability discrimination claim, genuine disputes of material fact precluded summary judgment on the issue of whether Plaintiff's leave was definite or indefinite, and also whether such leave could be a form of reasonable accommodation in relation to whether the termination was for a non-discriminatory reason. The Court now further examines such issues as applied to the failure to accommodate claim to determine if this analysis changes.

Defendants argue that California law is clear that they did not need to accommodate

---

[17] The Court notes that in quoting the relevant California Code, Cal. Gov't Code § 12940(n), Defendants quote the portion reading employers must provide reasonable accommodation in response to a request by an employee with a known disability (Mot. 21), but leave out the following portion which reads "or known medical condition," which the Court assumes is a less demanding standard than known physical or mental disability. See Cal. Gov't Code § 12940(n).

Plaintiff with an indefinite leave of absence.[18]  Against this backdrop of case law regarding indefinite leave, Defendants argue that even though Plaintiff was not entitled to any leave, Stoneledge allowed him to take a nearly 45-day leave of absence and only terminated Plaintiff after he confirmed that he did not know when he would be able to return to work.

Plaintiff argues that a jury could reasonably conclude that Stoneledge failed to accommodate Plaintiff by refusing to give him an additional nineteen days to heal, and a genuine issue of fact remains as to whether Plaintiff was on definite leave or indefinite leave.  While similar to the previous section's analysis on indefinite leave, Plaintiff emphasizes additional facts, disputed and undisputed.

First, Plaintiff states that Defendants considered giving Plaintiff a hard deadline to return to work, but decided not to send him a letter to that effect.  (PADF 4.)[19]  Plaintiff states the company intended to terminate Plaintiff because his leave was not protected, however Stoneledge decided to go through the interactive process, which the Court notes is essentially undisputed (DUMF 35, 36).  Plaintiff then states the HR department "circulated an ADA questionnaire with staff to begin the "interactive process" (PADF 5), to facilitate Mr. Mosley's

---

[18]  In this regard, Defendants cite many of the same cases the Court reviewed in the previous section, in addition to Canupp v. Children's Receiving Home of Sacramento, 181 F. Supp. 3d 767 (E.D. Cal. 2016).  In Canupp, the employee began suffering back pain anticipating surgery approximately three years after being hired, and to accommodate the disability, went on protected leave under the Family Medical Leave Act with a calculated expiration date approximately one month after beginning.  181 F.Supp.3d at 773.  Because the employee could not resume work by that date, the employer provided an additional thirty days of personal leave, and when Plaintiff did not return following the expiration of the personal leave, the employer terminated the employee.  Id.  The court granted the employer's motion for summary judgment for FEHA disability discrimination claims and failure to provide reasonable accommodation, and the court held "[u]nder FEHA, this sort of indefinite leave is not a reasonable accommodation," and held "[b]ecause the undisputed evidence shows that the duration of any leave of absence at the time plaintiff's termination would have been indefinite, plaintiff cannot show that any additional leave would have been a reasonable accommodation under FEHA."  Id. at 778, 798.

[19]  Defendants argue this is disputed stating while it is undisputed that the company did not send him a letter with a hard deadline, there is no evidence that it considered doing so, and whether the company is considered something is irrelevant.  (ECF No. 23-2 at 6.)  The deposition testimony Plaintiff cites for this fact shows that Jimenez states they did not send such letter, and when asked if there is any reason why such letter would not have gone out, Jimenez states it was her "understanding . . . that Mr. Mosley wasn't going to come back to work after the 2nd or on the 2nd. He wasn't sure if he was going to come back to work at all."  (Jimenez Dep. 57:1-13.)  So, while Defendant is correct there is no statement that says the company considered sending such a letter, the deponent offered a potential reason why it would not have been issued.

return to work on January 5, 2018."[20]  Following this, Jimenez-Robbins stopped the interactive process, and suggested that Barrera talk to him because "sometimes they rather quit then go through that process."  (PUMF 23.)[21]  Barrera then asked Plaintiff to resign.  (PUMF 24.)  Plaintiff then received a call from Barrera and was told that he would be better off just to "quit."  (PADF 6.)[22]  Plaintiff told Barrera that the doctor is running more tests and that he was going to see the doctor again.  (PADF 7)[23]  Aside from conversations with Saavedra when Plaintiff submitted the two doctor's notes and any telephone conversations Plaintiff had with Barrera, the company did not ask Plaintiff for more information related to his absence from work.  (PUMF 26.)  Plaintiff was never asked to provide clarification from his doctor, nor was he asked about what further information was needed to assist the company in determining how it could accommodate Plaintiff upon his return to work on January 2, 2018.  (PUMF 27.)

After Plaintiff was terminated on December 14, 2017 (DUMF 42), Plaintiff's doctor released him to work on December 23, 2017, telling him he could do whatever he could tolerate

---

[20]  As to whether this ADA questionnaire was circulated to begin the interactive process is disputed by Defendants, who state that while it is undisputed that Barrera circulated a draft letter and questionnaire among staff, the alleged motivation of beginning the interactive process is not supported by the evidence, but only supports the fact that Barrera created the unused draft letter.  (ECF No. 23-2 at 6.)  While not cited to precisely by Plaintiff, the surrounding deposition testimony does show that when asked the reason why he wanted to send an ADA questionnaire letter, and whether it was so he could start the interactive process with Plaintiff, Barrera responds "I believe so."  (Barrera Dep. 26:19-27:3.)  Plaintiff's statement of fact based on this deposition testimony seems reasonable.

[21]  The Court notes that PUMF 23 does not include the statement that Jimenez-Robbins "stopped the interactive process," but rather says "[i]n response to the [sic] Mr. Barrera's email circulating the ADA questionnaire, Ms. Jiminez [sic] wrote 'Miscommunication but not ADA', [sic] and suggested that Mr. Barrera talk to Mr. Mosley because 'sometimes they rather quit then [sic] go through that process.' "

[22]  Defendant states this fact is disputed, but not in a material way, stating it is undisputed that Barrera offered Plaintiff the opportunity to resign rather than being involuntarily terminated, but dispute the language used, however state regardless of the language used, it is undisputed that the company offered him the choice between resigning and termination, and chose not to resign.  (ECF No. 23-2 at 6-7.)

[23]  Defendants dispute this fact, also arguing it is irrelevant, and state that Barrera did not testify that Plaintiff told him the doctor was running more tests, arguing that Plaintiff does not introduce corroborating testimony and that conclusory statements in affidavits are not sufficient.  (ECF No. 23-2 at 7.)  However, the Court notes that Plaintiff's statement is not only based on his declaration, but his deposition testimony where he states that during the conversation with Barrera, he told him "I don't know when I'm going to be able to come back until the doctor gets done with the tests.  I didn't - - I didn't give him a date."  (Mosley Dep. 56:5-8.); see Urrutia v. Chipotle Mexican Grill, Inc., No. CV1602065BROMRWX, 2017 WL 2901717, at *6 (C.D. Cal. June 16, 2017) (overruling sham affidavit objection as the non-moving party may explain or clarify prior testimony elicited by opposing counsel on deposition).

(DUMF 44). Plaintiff intended to go back to work on January 2, 2018 after he learned more from his doctor, but learned he was terminated. (PADF 8.)[24] At the time of termination Plaintiff felt he was capable of tolerating three days a week as a Retail Sales Associate if he was still employed after January 2, 2018. (PADF 9.)[25] The company did not seek further clarification from Plaintiff's doctor about when he could return to work (PUMF 36-38). (Opp'n 21.)

Taking these facts together, both disputed and undisputed, and viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendants failed to complete the interactive process in good faith. There is sufficient evidence in the record before the Court to demonstrate to a reasonable jury that Defendants' characterization of the leave as indefinite may not be proper or accurate, and that Defendants terminated Plaintiff prior to the January 2, 2018 date in the second doctor's letter.

As discussed above, the cases cited by Defendants do not support the absolute argument concerning indefinite leave that Defendants seem to be putting forth, but rather demonstrate there are different levels of indefiniteness as it relates to periods of leave, and there is interplay with

---

[24] Defendants dispute this fact by arguing that it contradicts Plaintiff's other testimony where he stated that as of November 28, 2017, neither he nor his doctor knew when he would be able to return to work (DUMF 38), and also testified that prior to December 23, 2017, it was unknown whether Plaintiff had stenosis or whether he would be able to return to work (DUMF 43). (ECF No. 23-2 at 8.) Defendants specifically argue that Plaintiff cannot manufacture a disputed fact by submitting a declaration contradicting his sworn deposition testimony, Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009). However, the Court does not find the proffered fact that Plaintiff "intended" to go back to work on January 2, 2018, to be in dispute with his deposition testimony, nor is such "intent" something that is wholly counter to DUMF 38 and 43. Plaintiff testified that: "I was scheduled to return to work January 2nd, which I intended to do and I was terminated December 15." (Mosley Dep. 32:25-33:2.) Plaintiff's declaration states: "At the time of this conversation with Mr. Barrera, the doctors had not finished with their tests. I intended to go back to work on January 2, 2018 after I learned more information through my doctors." (ECF No. 21-4 at 2.); see Urrutia v. Chipotle Mexican Grill, Inc., No. CV1602065BROMRWX, 2017 WL 2901717, at *6 (C.D. Cal. June 16, 2017) (overruling sham affidavit objection as the non-moving party may explain or clarify prior testimony elicited by opposing counsel on deposition).

[25] Defendants dispute this fact saying it contradicts other testimony that as of November 28, 2017, neither he nor his doctor knew when he would be able to return to work (DUMF 38), and also that prior to December 23, 2017, it was unknown whether Plaintiff had stenosis or whether he would be able to return to work (DUMF 43). Plaintiff stated in deposition that: "Well, I was scheduled to go back to work on January 2nd. Actually, I was terminated December 15th and on the 23rd after all of my tests were done, the doctor told me I could do whatever I could tolerate. And I felt that I could tolerate three days a week." (Mosley Dep. 74:13-17.) In his declaration, Plaintiff states that when he visited his doctor on December 23, 2017, "I was told I could do whatever I could tolerate. I felt I could tolerate three days a week as a Retail Sales Associate, and I would have returned to work after January 2, 2018." (ECF No. 21-4 at 2.) Therefore, the Court feels the characterization in Plaintiff's briefing that this statement is how Plaintiff felt at the time of termination, is more appropriately characterized as how Plaintiff felt on December 23, 2017, a date shortly after termination.

the level of disability that creates a fact-specific analysis that the Court finds more appropriate for the jury and unsuitable for determination on summary judgment. Further, given the interplay of the facts described above, a dispute over whether the leave of absence was indefinite, or at least whether the employer considered or made the determination that it was indefinite in good faith exists in this case. Scotch v. Art Inst. of California, 173 Cal.App.4th 986, 1014 (2009) ("Both employer and employee have the obligation to keep communications open and neither has the right to obstruct the process.") (internal citations and quotation marks omitted); Gelfo v. Lockheed Martin Corp., 140 Cal.App.4th 34, 62 n.22 (2006) ("Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.").

Accordingly, for all of the above reasons, while the Court shall grant Defendants' motion for summary judgment on the failure to accommodate claim to the extent it is based on a policy requiring Plaintiff to stand in October of 2017, the Court shall deny Defendants' motion for summary judgment on the failure to accommodate claim to the extent such claim is based on the failure to accommodate Plaintiff with a leave of absence for the period of temporary disability set by Plaintiff's doctor's note.

## C. The Age Discrimination Claim

The parties agree that in order to state a prima facie case of age discrimination under FEHA, a plaintiff must generally present evidence that: (1) the employee is over the age of 40; (2) the employee suffered an adverse employment action; (3) the employee was performing satisfactorily at the time of the adverse action; and (4) demonstrates circumstances giving rise to an inference of unlawful discrimination. Henshaw v. Hartford Ins., No. CIV.S04-0022DFLKJM, 2005 WL 1562265, at *6 (E.D. Cal. June 30, 2005); Hersant v. Dep't of Soc. Servs., 57 Cal.App.4th 997, 1002-1003 (1997); Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 355 (2000). A plaintiff can meet this burden by offering "circumstantial evidence such that a reasonable inference of age discrimination arises," and "[t]he requirement is not an onerous one." Henshaw,

1    2005 WL 1562265, at *6 (quoting <u>Hersant</u>, 57 Cal.App.4th at 1002-1003).

2       Defendants do not challenge elements one (1) and two (2), and the Court presumes those
3    are met. Defendants argue that as to element three (3), Plaintiff cannot demonstrate that he was
4    performing satisfactorily at the time of the adverse employment action because when he was
5    terminated on December 15, 2019, he was absent from work. (Mot. 24.) It is undisputed that
6    Plaintiff was retained as a part time employee because "he is great," "everybody loves him," and
7    "he puts up great numbers." (PUMF 4.) Saavedra also confirmed that Plaintiff performed well
8    until he took a leave of absence. (PUMF 5.) It is also undisputed that Jimenez-Robbins, who
9    made the decision to terminate Plaintiff, was not aware of any performance issues. (PUMF 8, 9,
10   10.) As the Court found above, there are multiple issues of fact as to whether Plaintiff was on an
11   indefinite or definite leave of absence, and whether such leave was allowable as a reasonable
12   accommodation, and a question of whether Defendants failed to complete the interactive process
13   as to that reasonable accommodation. For these reasons, the Court cannot say that simply
14   because Plaintiff was on a leave of absence at the time that he was terminated that he cannot be
15   considered satisfactorily performing his duties, as there are open questions of whether the leave
16   was proper, and such holding would seem to go against the intent and purpose of the disability
17   and age discrimination laws. Thus, the Court finds Plaintiff has satisfied element three (3) of the
18   prima facie case for age discrimination.

19      As to element four (4), Defendant argues that Plaintiff was hired at the age of seventy-
20   seven (77), and because Stoneledge made an exception to allow him to work part-time (DUMF
21   25-26, 47), both his hiring and termination occurred within a very short period of time, and thus
22   there is a strong inference of no discrimination, <u>Horn v. Cushman & Wakefield Western</u>, 72
23   Cal.App.4th 798, 809 (1999). Plaintiff responds that the inference described in <u>Horn v.</u>
24   <u>Cushman</u> is distinguishable from the facts of this case as the plaintiffs in <u>Horn</u> and cases cited in
25   <u>Horn</u> were hired under a competitive process, where here Plaintiff was transitioned over to
26   Stoneledge with the other employees when the ownership of the store was transferred. (Opp'n
27   27-28.) It is undisputed that in October of 2017, Stoneledge took ownership of the store,
28   employees were transitioned over, no retail sales associates were interviewed for the job, there

were no job postings for the positions at the time of the acquisition, and Saavedra testified everyone would be retained as part of the transition. (PUMF 12-17.) For these reasons, the Court agrees with Plaintiff that Defendants cannot show, for purposes of summary judgment, that Plaintiff's hiring and termination were within a very short period of time, and finds the inference of non-discrimination is inapplicable.

However, even without such inference, Plaintiff's age discrimination claim fails. It is undisputed that Plaintiff testified that he did not feel like anyone made a negative comment to him about his age in a disparaging way (DUMF 48), Plaintiff made jokes about his age and while people called him "old man," he did not feel it was derogatory and felt people were joking along with him (DUMF 49, 50), and Plaintiff was invited to reapply (DUMF 45). Plaintiff does not put forth any direct evidence of age discrimination in his opposition brief, instead only relying on evidence of hiring practices that he argues shows a pattern of hiring younger employees. (Opp'n 21.) Plaintiff argues that given the light burden faced at the summary judgment stage, Stoneledge's hiring practices confirm a pattern of hiring younger employees, emphasizing that within a couple months Stoneledge hired one "young lady" estimate to be in her early 20's, and a man, estimated to be in his 50's or 60's, as retail sales associates. Plaintiff also highlights that the majority of the associates retained beyond Plaintiff's termination are in their 20's or 30's, ranging from forty to fifty years younger than Plaintiff, listing ten associates in their 20's to 30's, and six other associates ranging in ages from late 40's to mid-60's.

Because Plaintiff proffers no direct evidence of discriminatory animus toward Plaintiff on account of his age, this Court must analyze the circumstantial case under the McDonnell Douglas framework. See McFarland v. Sears Holdings Mgmt., No. C 11-4587 PJH, 2013 WL 1333720, at *3–4 (N.D. Cal. Mar. 29, 2013). Plaintiff appears to rest the entire age discrimination claim on a small sampling of employees with ages ranging from in their 20's to their 60's. The Ninth Circuit has held "that, if reliable, generalized statistical data is relevant and admissible at the prima facie case stage of a disparate treatment employment discrimination lawsuit." Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531, 550 (9th Cir.1982). Importantly here, "if the claim analyzed is individual rather than class, the statistics must be

relevant to the particular plaintiff's claim." Gay v. Waiters', 694 F.2d at 550. Accordingly, where a plaintiff chooses to rely solely on statistical evidence to carry his prima facie burden, "[he] must show a stark pattern of discrimination unexplainable on grounds other than age." Rose v. Wells Fargo & Co., 902 F.2d 1417, 1423 (9th Cir.1990) (internal citation omitted). "In practice, the Ninth Circuit's 'unexplainable on grounds other than age' standard has meant that plaintiffs relying solely or even primarily on statistical evidence have been unable to satisfy the prima facie case." Schechner v. CBS Broad., Inc., No. C 08-05049 MHP, 2010 WL 2794374, at *7–8 (N.D. Cal. July 15, 2010) (quoting Coleman v. Quaker Oats Co., 232 F.3d 1271, 12832 (9th Cir. 2000)). "In the few cases in which statistical evidence aided a Plaintiff in establishing a prima facie case, the plaintiff bolstered his claim of discriminatory intent with other pieces of non-statistical evidence." Schechner 2010 WL 2794374, at *8 (internal citations omitted).

With such a small sample presented by Plaintiff, such evidence can hardly be characterized as statistical evidence, and even if it were, it would not be sufficient to maintain a prima facie case of age discrimination. See, e.g., Day v. Sears Holdings Corp., 930 F.Supp.2d 1146, 1172 (C.D. Cal. 2013) (sampling of pool of sixteen employees too small to constitute substantial and specific evidence). "While statistical evidence can, if sufficiently probative, demonstrate bias, mere reference to the number of lay-offs and retentions is not sufficient circumstantial evidence to withstand summary judgment." Narayanan v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ., No. 3:11-CV-00744-LRH-VP, 2014 WL 827853, at *10 (D. Nev. Mar. 3, 2014), aff'd sub nom. Fernandez v. Bd. of Regents of Nevada Sys. of Higher Educ., 645 F. App'x 572 (9th Cir. 2016). "Statistical analysis purporting to show a disparity in employment discrimination cases is 'not enough to take [a] case to trial' if it fails 'to account for obvious variables,' which can include 'education, previous position at the company, and distribution of age groups by position'—'that would have affected the results of the analysis.'" Barnes v. The Hershey Co., No. 3:12-CV-01334-CRB, 2016 WL 192310, at *9 (N.D. Cal. Jan. 15, 2016) (quoting Coleman v. Quaker Oats Co., 232 F.3d 1271, 1283 (9th Cir. 2000)). "An employee may use proper statistical evidence to demonstrate a pattern and practice of discrimination . . . [h]owever, to create an inference of intentional discrimination, statistics

1    must demonstrate a significant disparity and must eliminate nondiscriminatory reasons for the

2    apparent disparity." Gratch v. Nicholson, No. C 04-03028 JSW, 2005 WL 2290315, at *4–5

3    (N.D. Cal. Sept. 20, 2005), aff'd sub nom. Gratch v. Mansfield, 259 F. App'x 978 (9th Cir.

4    2007).

5         Plaintiff's sampling of retained employees, which includes six employees who are above

6    the age of forty, and thus within the same protected class, with no further statistical analysis and

7    no further evidence of discriminatory intent, fails to put forth a prima facie case. Accordingly,

8    for all of the above reasons, the Court finds Plaintiff cannot make a prima facie case of age

9    discrimination and grants Defendants' motion for summary judgment as to Plaintiff's claim for

10   age discrimination.

11        **D.    Plaintiff's Claim for Wrongful Termination in Violation of Public Policy**

12        Defendants argue that because Plaintiff's claim for wrongful termination in violation of

13   public policy is derivative of his FEHA violation claims, and because Plaintiff cannot establish

14   his FEHA claims, this claim likewise cannot proceed. (Mot. 26.)

15        As the Court found above, Plaintiff failed to establish an age discrimination claim, and

16   accordingly, any claim for wrongful termination in violation of public policy based on the age

17   discrimination claim must also fail. Thus, the Court grants Defendants' motion for summary

18   judgment as to Plaintiff's claim for wrongful termination in violation of public policy to the

19   extent it is based on the age discrimination claim.

20        However, Plaintiff's disability discrimination claim based on his termination of

21   employment, and Plaintiff's failure to accommodate claim remain. Thus, to the extent Plaintiff's

22   claim for wrongful termination in violation of public policy is grounded in these claims, such

23   claim survives. See Rezvan v. Philips Elecs. N. Am. Corp., No. 15-CV-04767-HSG, 2016 WL

24   8193160, at *8 (N.D. Cal. Dec. 15, 2016) ("Since summary judgment must be denied on

25   Plaintiff's underlying FEHA disability discrimination claim, so too must it be denied on her"

26   wrongful termination in violation of public policy claim.); Kelley v. Corr. Corp. of Am., 750

27   F.Supp.2d 1132, 1145 (E.D. Cal. 2010) ("Since Plaintiff's claims for failure to accommodate and

28   failure to engage in the interactive process have survived Defendant's motion to dismiss, the

court finds that dismissal of Plaintiff's wrongful termination claim is not warranted.").

**E.    Defendants' Motion to Dismiss all Claims Against Defendant AFI**

To prevail on his claims under California's Fair Employment and Housing Act ("FEHA"), Plaintiff must establish that each Defendant was Plaintiff's employer. See Cal. Gov't Code § 12926; Kelly v. Methodist Hosp. of S. Cal., 22 Cal.4th 1108, 1116 (2000). Plaintiff names Ashley Furniture Industries, Inc. ("AFI"), as a Defendant in his claims brought pursuant to FEHA. (ECF No. 1-3.) Defendants move for adjudication of all claims against Defendant AFI arguing that the undisputed evidence shows that while Defendant Stoneledge was Plaintiff's employer, Defendant AFI was not Plaintiff's employer for purposes of the FEHA claims.

When determining if a corporation is an employer for purposes of FEHA, there is a presumption that separate corporate entities such as Stoneledge and AFI are not co-employers. See Huse v. Auburn Honda, No. CIV.S-04-0227DFL/JFM, 2005 WL 1398521, at *3 (E.D. Cal. June 10, 2005); Urrutia v. Chipotle Mexican Grill, Inc., 2017 WL 2901717 at *11 (C.D. Cal., Jun. 16, 2017) ("Although under some circumstances two corporations may be treated as a single employer, there is a strong presumption against holding a parent corporation liable for the acts or omissions of the subsidiary on the theory that the two corporate entities constitute a single employer . . . the corporate form is disregarded only when the ends of justice require this result.").

The presumption against finding separate corporate entities to be co-employers can be overcome if: (1) the entities can be considered a "single employer" or "integrated enterprise," (2) the entities can be considered "joint employers," or (3) one entity is the agent of another entity. Huse, 2005 WL 1398521, at *3 (citing Morgan v. Safeway Stores, Inc., 884 F.2d 1211, 1213 (9th Cir. 1989); Wynn v. Nat'l Broad. Co., Inc., 234 F.Supp.2d 1067, 1093 (C.D. Cal. 2002); Laird v. Capital Cities/ABC, Inc., 68 Cal.App.4th 727 (1998)). Before addressing whether Defendant AFI can be considered a co-employer under either of these three tests, the Court will now summarize the facts relevant to such determination.

The following facts are undisputed: a) Defendant Stoneledge was Plaintiff's employer from October 1, 2017, until his termination (DUMF 3); b) Plaintiff worked at the Ashley

Furniture Homestore in Visalia that was operated by Stoneledge (DUMF 4); c) Stoneledge is a wholly owned subsidiary of Ashley Global Retail, LLC ("AGR") and both AGR and Defendant Ashley Furniture Industries, Inc. ("AFI") are both wholly owned subsidiaries of the same parent corporation (DUMF 5); d) AFI provides certain shared services to Stoneledge including certain limited human resources services such as administrating medical leaves (DUMF 6); e) Stoneledge paid Mosley his wages and benefits and taxes (DUMF 7); f) Stoneledge had the authority to hire and fire, transfer, promote, discipline or discharge Mosley, establish his work schedules, determine his compensation, and supervise his work (DUMF 8); and g) AFI did not pay Mosley his wages, benefits, or taxes (DUMF 9).

Plaintiff emphasizes DUMF 6, arguing the medical leave of absence is squarely at issue in this case, and highlighting that the leave coordinator communicated to Plaintiff using Ashley Furniture Stores letterhead. (Opp'n 29.) To clarify Plaintiff's contention, the Court notes that on November 27, 2017, on letterhead reading "Ashley Furniture Industries, Inc.," Liza Cuenca, identified as the "Leave Coordinator" for "Ashley Companies Leave Department" in the signature line of the letter, wrote to Plaintiff stating:

> You are not eligible for Federal Family and Medical Leave Act . . . due to not meeting the eligibility requirement . . . [and] [y]ou are currently not eligible for Company Personal Medical Leave. Your absences may be subject to the Company's attendance policy. Your supervisor will be informed of your denial for leave under Company Personal Medical Leave. If you have questions regarding the time missed as it relates to the Company's attendance policy please contact your area's Human Resources Representative at 909-572-2207.

(ECF No. 17-3 at 24.) The Court notes that the term "Company" is not defined in the letter. (Id.)

Plaintiff also argues that email correspondence addressing Plaintiff's right to protected leave confirms Liza Cuenca is an "HR Admin & Leave Coordinator acting on behalf of AFI." (Opp'n 30.) The Court notes that in the email from Liza Cuenca, she identifies herself as an "HR Admin. & Leave Coordinator" for "Ashley Furniture Industries, Inc." (ECF No. 17-3 at 31-32.) Her email domain is "@Ashleyfurniture.com," while the employees at Stoneledge use the domain "@Ashleyhomestores.com." (Id.) In the email, Cuenca states the "absences may be

subject to the Company's attendance policy." (Id.)  Again, the term "Company" is not defined. (Id.)

In consideration of the facts identified above, the Court now turns to the question of whether any genuine material issue of fact precludes summary judgment on the issue of whether: 1) Defendants Stoneledge and AFI are a single employer or integrated enterprise; 2) Defendants Stoneledge and AFI are a joint employer; or 3) Defendant Stoneledge is an agent of Defendant AFI.

### 1.    Whether AFI and Stoneledge are a Single Employer or Integrated Enterprise

When considering whether two entities are a single employer or an integrated enterprise, courts consider four factors: (1) the interrelation of their operations; (2) whether they have common management; (3) where there is centralized control of labor relations; and (4) whether they are under common ownership or financial control.  Santos v. TWC Admin. LLC, No. CV1304799MMMCWX, 2014 WL 12558274, at *16 (C.D. Cal. Nov. 3, 2014) (citing Laird v. Capital Cities/ABC, Inc., 68 Cal.App.4th 727, 737-38 (1998)).  Although the four factors should be considered together, the centralized control of labor relations is often considered the most pertinent of the factors.  Id.; see also Huse v. Auburn Honda, 2005 WL 1398521, at *3 n.3.

Defendants argue that AFI and Stoneledge are not a single employer or integrated enterprise because: 1) AFI is an indirect affiliate of Stoneledge and Stoneledge is a wholly-owned subsidiary of Ashley Global Retail, LLC ("AGR") (DUMF 5); 2) AGR and AFI are wholly-owned subsidiaries of another parent corporation (DUMF 5); and 3) Stoneledge and AFI are not a single entity nor have a parent-subsidiary relationship.

Plaintiff has not submitted evidence that Stoneledge and AFI have common management, that they are under common ownership or financial control, and has only submitted minimal evidence of the potential of interrelated operations or centralized control of labor relations given the fact that AFI provides human resource assistance with the administration of personal leave. The Court finds that the limited evidence submitted concerning the HR administrative services provided by AFI would not permit a reasonable jury to overcome the strong presumption against finding separate corporate identifies to be co-employers.  See Santos, 2014 WL 12558274, at

*16; Urrutia v. Chipotle, 2017 WL 2901717 at *11; Djukich v. AutoNation, Inc., No. CV1304455BROAGRX, 2014 WL 12845831, at *6–7 (C.D. Cal. May 27, 2014).

Centralized control of labor relations is often considered the most important of the four factors of the integrated enterprise test, and this factor's "critical question is what entity made the final decisions regarding employment matters related to the person claiming discrimination?" Maddock v. KB Homes, Inc., 631 F. Supp. 2d 1226, 1241 (C.D. Cal. 2007) (noting a "parent's broad general policy statements regarding employment matters are not enough to satisfy this prong. To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary.") Although AFI may have provided limited HR services related to personal leave, such fact does not rise to a reasonable inference that AFI exercised such power and influence over personnel and compensation decisions that AFI can be considered Plaintiff's employer under California law. See Djukich v. AutoNation, Inc., 2014 WL 12845831, at *6–7 (granting summary judgment as evidence that parent auto dealership corporation provided employee benefits to dealership employees and issued human resource and ethics guidelines to dealership was insufficient to show final control over employment matters); Cellini v. Harcourt Brace & Co., 51 F.Supp.2d 1028, 1034 (S.D.Cal.1999) (finding control prong of integrated enterprise test not met despite fact that defendant had issued a code of conduct that applied to subsidiary's employees and even though the defendant provided employee benefits programs and sexual harassment seminars to these employees noting that these facts do not demonstrate control over day-to-day employment decisions such as hiring, performance evaluations and work assignments); Maddock v. KB Homes, Inc., 631 F. Supp. 2d 1226, 1240 (C.D. Cal. 2007) ("Plaintiff's evidence that KB Home provides certain training materials for use by its subsidiaries falls short of establishing that KB Home exercises abnormal influence over the personnel decisions of these subsidiaries. Moreover, KB Home's retention of certain payroll and personnel information relating to its sales agents does not indicate a degree of control over its subsidiaries that would constitute interrelation of operations.").

Rather, the undisputed evidence establishes that Stoneledge was Plaintiff's employer at all relevant times (DUMF 3-9). See Urrutia v. Chipotle, 2017 WL 2901717 at *12 (plaintiff

offered no evidence that Chipotle paid his salary or benefits, trained him, had authority to establish work schedule or assignments, or determined compensation.)

### 2. Whether AFI and Stoneledge are a Joint Employer

To determine whether a company is a joint-employer, California courts use a totality of the circumstances test that reflects on the nature of the work relationship of the parties, and consider the following factors: (1) the nature and degree of control over employees; (2) the day-to-day supervision of employees, including discipline; (3) the authority to hire and fire employees and set conditions of employment; (4) the power to set pay rates or payment methods; and (5) control of employee records, including payroll. Urrutia v. Chipotle, 2017 WL 2901717 at *11 n.12, 13 (citing Jones v. County of Los Angeles, 99 Cal.App.4th 1039, 1045–46 (2002)). The key factor in determining whether an entity is an employer is "the right to control and direct the activities of the person rendering service, or the manner and method in which the work is performed." Id. (quoting Doe I v. Wal–Mart Stores, Inc., 572 F.3d 677, 682 (9th Cir. 2009) (internal quotation marks and citations omitted)). Courts also look to the following more specific considerations in analyzing the totality of the circumstances and right to control employment:

> [1] [P]ayment of salary or other employment benefits and Social Security taxes, [2] the ownership of the equipment necessary to performance of the job, the location where the work is performed, [3] the obligation of the defendant to train the employee, [4] the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, [5] the authority to establish work schedules and assignments, [6] the defendant's discretion to determine the amount of compensation earned by the employee, [7] the skill required of the work performed and the extent to which it is done under the direction of a supervisor, [8] whether the work is part of the defendant's regular business operations, [9] the skill required in the particular occupation, [10] the duration of the relationship of the parties, and [11] the duration of the plaintiff's employment.

Id. (quoting Rhodes v. Sutter Health, 949 F. Supp. 2d 997, 1003 (E.D. Cal. 2013)).

For the same reasons that the Court found insufficient evidence to find AFI as a single employer or integrated enterprise, the Court finds Plaintiff has not submitted evidence to overcome the strong presumption against finding separate corporate entities to be a joint employer. Rather, the undisputed facts establish that Stoneledge was Plaintiff's employer at all relevant times, when such facts are applied to each of the factors described above (DUMF 3-9).

See, e.g., Urrutia v. Chipotle, 2017 WL 2901717 at *11 (citing Rhodes, 949 F. Supp. 2d at 1003); Cellini v. Harcourt Brace & Co., 51 F. Supp. 2d 1028, 1034 (S.D.Cal.1999); DelGiacco v. Cox Commc'ns, Inc., No. SACV 14-0200 DOC, 2015 WL 1535260, at *8 (C.D. Cal. Apr. 6, 2015); Valdez v. Local 9509, Commc'ns Works of Am., AFL-CIO, No. 09CV0811 JAH (AJB), 2011 WL 13177359, at *3–4 (S.D. Cal. Sept. 26, 2011).

### 3. Whether Stoneledge is an Agent of AFI

To "establish a parent corporation's liability for acts or omissions of its subsidiary on an agency theory, a plaintiff must show more than mere representation of the parent by the subsidiary in dealings with third persons. The showing required is that a parent corporation so controls the subsidiary as to cause the subsidiary to become merely the agent or instrumentality of the parent[.]" Laird v. Capital Cities/ABC, Inc., 68 Cal.App.4th 727, 741-42 (1998) (emphasis in original) (internal quotation marks and citations omitted); see also DelGiacco v. Cox Commc'ns, Inc., No. SACV 14-0200 DOC, 2015 WL 1535260, at *8 (C.D. Cal. Apr. 6, 2015); Herrock v. Sutter Health, No. 2:13-CV-00557-MCE, 2014 WL 5501217, at *6 (E.D. Cal. Oct. 30, 2014).

Based on the same underlying facts and similar analysis as applied to the previous two subsections, the Court finds no such showing of agency between AFI and Stoneledge as to make AFI an employer for purposes of FEHA. Despite the fact that AFI may have provided limited HR administrative services concerning protected leave, such "facts, however, are insufficient to establish an agency relationship between [AFI] and [Stoneledge] because they do not demonstrate that [AFI] exercised any control over [Stoneledge's] day-to-day employment decisions." Cellini v. Harcourt Brace & Co., 51 F.Supp.2d 1028, 1034 (S.D. Cal. 1999) (finding no agency theory of liability applicable despite fact that company provided employee benefits programs for related corporation's employees, issued the applicable code of conduct, and provided sexual harassment seminars for the other corporation's employees); see also DelGiacco v. Cox Commc'ns, Inc., No. SACV 14-0200 DOC, 2015 WL 1535260, at *8 (C.D. Cal. Apr. 6, 2015) (granting summary judgment because of "insufficient evidence to show that subsidiary was merely an agent of parent as opposed to a separate corporate entity with its own employees,

budget, and operations," and despite facts that "local supervisors and HR personnel could consult with CCI's HR department or legal department on HR issues and the fact that CCI decided to close the Rancho Santa Margarita call center, which by necessity meant laying off or transferring employees, do not demonstrate that CCI was involved in the day-to-day employment decisions of CoxCom or CCC. Nor does the fact that CCI, through UNUM, handled FMLA administration for its subsidiaries.") (emphasis added); Valdez v. Local 9509, Commc'ns Works of Am., AFL-CIO, No. 09CV0811 JAH (AJB), 2011 WL 13177359, at *3–4 (S.D. Cal. Sept. 26, 2011) (Despite plaintiff's argument that AT&T acted as Pacific Bell's agent when it provided "human resources support, including mailing out company initiated leave ("CIL") letters and 5-day letters that resulted in the decision to terminate Plaintiff," based on the totality of the circumstances, including the lack of any evidence demonstrating AT&T controlled Plaintiff's performance of her duties, there is insufficient evidence to support Plaintiff's claim that AT&T is liable as an employer for claims brought under the FEHA," and was thus entitled to summary judgment on the FEHA claims.)

For all of the above reasons, the Court finds no genuine issue of material fact precluding summary judgment on the issue of whether Defendant AFI is Plaintiff's employer for purposes of Plaintiff's FEHA claims. Accordingly, the Court shall grant Defendants' motion for summary judgment as to this issue. To the extent that any of Plaintiff's claims are based on Defendant AFI's status as Plaintiff's employer under FEHA, such claims are dismissed against Defendant AFI.

**F.    Punitive Damages**

Punitive damages are available for Plaintiff's FEHA claims and for the wrongful termination in violation of public policy claim. Rezvan v. Philips Elecs. N. Am. Corp., No. 15-CV-04767-HSG, 2016 WL 8193160, at *11 (N.D. Cal. Dec. 15, 2016) (citing Commodore Home Sys., Inc. v. Superior Court, 32 Cal.3d 211, 220-21 (1982)). To obtain punitive damages, Plaintiff must demonstrate by clear and convincing evidence that Defendants, or an officer, director, or managing agent of Defendants, acted with oppression, fraud, malice, or ratified such conduct. Cal. Civ. Code. § 3294. It is appropriate for the Court to apply the clear and

convincing standard in consideration of a summary judgment motion. See Basich v. Allstate Ins. Co., 87 Cal.App.4th 1112, 1118-19 (2001); Rezvan v. Philips, 2016 WL 8193160, at *11. The clear and convincing standard "requires a finding of high probability . . . so clear as to leave no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind." Scott v. Phoenix Sch., Inc., 175 Cal.App.4th 702, 715 (2009) (internal quotation marks and citations omitted). While "the higher evidentiary standard must be taken into account," "the clear and convincing evidence standard does not impose on a plaintiff the obligation to prove a case for punitive damages at summary judgment." Rezvan v. Philips, 2016 WL 8193160, at *11 (citing Spinks v. Equity Residential Briarwood Apartments, 171 Cal.App.4th 1004, 1053 (2009) (internal quotation marks omitted)).

      1.    Whether a Jury Could Deem Jimenez-Robbins a Managing Agent

Defendants first argue that Plaintiff cannot offer any evidence that any relevant decision was made or ratified by a director, officer, or managing agent of Defendants. The California Supreme Court held the meaning of "managing agent" for purposes of Section 3294 is as follows:

> [P]rincipal liability for punitive damages [does] not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business.

White v. Ultramar, Inc., 21 Cal.4th 563, 576-77 (1999).

Defendants argue that Jimenez-Robbins, Barrera, Cuenca, and Saavedra are not officers, directors, or managing agents of Defendants, citing DUMF 52, a fact disputed by Plaintiff.[26]

---

[26] DUMF 52 is disputed by Plaintiff. DUMF 52 states that these individuals are not officers, directors, or managing agents of Stoneledge, and have not ever been, and do not set Stoneledge's corporate policy. Plaintiff states this is disputed "as it is unsupported by the evidence. Ms. Jimenez-Robbins is the Senior Human Resources Manager." (ECF No. 23-3 at 20-21, citing Jimenez Dep. 13:4-11.) Defendant responds that Plaintiff's statement is argument and not based on any fact, offering no evidence to support the claim that Jimenez title makes her an officer, director, or managing agent of Stoneledge, arguing that simply having the word "manager" in a title does not make one a

Plaintiff contends that Defendants make a conclusory argument that none of the decisionmakers have the ability to change policy, and have not carried their burden here, including addressing whether Jimenez-Robbins is a managing agent of the LLC.

Jimenez-Robbins testified on behalf of Stoneledge as the PMQ on topics including the termination of Plaintiff, and Stoneledge's policy regarding reasonable accommodation for disability. (Jimenez-Robbins Dep. 12:2-18). Jimenez-Robbins is Stoneledge's Senior HR Manager that oversees all the stores in the western United States, including California, Arizona, Nevada, and Utah. (Jimenez-Robbins Dep. 13:3-11.) During the relevant time period, Jimenez-Robbins oversaw three HR generalists over California, one HR manager over Arizona, Nevada, and Utah, and believes she oversaw five HR administrators at the time. (Id. at 13:12-14:3.) At the time, in terms of HR hierarchy, Denney Berrera was the Senior HR Generalist for the Visalia location, and reported to Jimenez-Robbins. (Id. 14:7-18.) Jimenez-Robbins made the ultimate decision to terminate Plaintiff, and confirmed that no one else made a decision or recommendation to terminate him. (Jimenez-Robbins Dep. 57:17-22.) Jimenez-Robbins testified that the company considered extending the leave to January 2, 2018, as a reasonable accommodation but based on conversations with Barrera, they did not believe he was going to be back on January 2, 2018, and did not conduct an undue hardship analysis of the impact of leaving the position open until January 2, 2018. (Jimenez-Robbins Dep. 63:14-24.)

"Whether someone is a 'managing agent' is a question of fact and the individual does not need to occupy any 'particular level' or 'official title.' " Pande v. Chevrontexaco Corp., 359 F. App'x 769, 770–71 (9th Cir. 2009) (quoting White, 21 Cal.4th at 576-77). Based on the facts described above, the Court finds a jury could reasonably conclude that Jimenez-Robbins was a managing agent for purposes of punitive damages because "supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents," and because the jury could find that she exercised "substantial discretionary authority over decisions that ultimately determine corporate policy." White, 21 Cal.4th at 576-

managing agent as that term is defined under the law, and given Jimenez's sworn declaration, and in the absence of any evidence to the contrary, Defendants argue DUMF 52 is in fact undisputed.

77.

The question of whether her decisions determine corporate policy does cause the Court to hesitate in this determination, however even on the limited factual record before it, the Court finds a jury can reasonably find she had the ability to set ad hoc corporate policy. The scope of the manager's position and the manager's actions in the seminal California Supreme Court case White provides guidance on this issue, and such facts were succinctly summarized by the Central District of California as follows:

> Applying these principles, the White court reviewed a jury's award of punitive damages against a convenience store company where the plaintiff's "zone manager," named Salla, was found to have fired plaintiff in retaliation for testifying at an unemployment benefits hearing. Salla managed eight stores and approximately sixty-five employees. Individual store managers reported to Salla, and Salla reported to department heads in the corporation's retail management department. These supervisors delegated "most, if not all, of the responsibility" for running the eight stores to Salla. Salla consulted the human resources department before firing plaintiff, id., and her supervisors testified that she lacked the authority to fire plaintiff without doing so. However, Salla apparently had some "ability to act independently." The court affirmed the jury's finding that Salla was a managing agent because she "exercised substantial discretionary authority over vital aspects of Ultramar's business that included managing numerous stores and making significant decisions affecting both store and company policy." Specifically, the court found that "[i]n firing White for testifying at an unemployment hearing, Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect of Ultramar's business." In a concurrence, two justices noted that although Salla did not "set any firm-wide or official policy .... she exercised authority that 'necessarily result[ed] in the ad hoc formulation of policy' that negatively affected the plaintiff. Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another Ultramar employee."

Garcia v. New Albertson's, Inc., No. 2:13-CV-05941-CAS, 2014 WL 4978434, at *6 (C.D. Cal. Oct. 3, 2014) (internal citations omitted). Of particular importance to the instant case is White's concurring opinion which highlights that even in the absence of setting formal corporation-wide policy, the manager exercised sufficient authority in her actions that resulted in the ad hoc formulation of policy that negatively affected the employee. White, 21 Cal.4th at 580 (Mosk, J., concurring).

The circumstances which may show an individual employee had the ability to formulate ad hoc policy are flexible and fact-dependent. In Garcia, the manager in question managed one store with eighty-five employees, and despite a corporate policy that such managers should

consult with their human resources representative to evaluate requested disability accommodations, such managers had discretion to handle accommodation requests and engage in the interactive process on their own, could decide whether to involve other levels of management, could conduct an interactive process meeting, could decide how to hold and document such interactive process meeting, and could decide whether to provide an accommodation. The <u>Garcia</u> court found such evidence "raise[d] a genuine issue as to [the manager's] role in formulating ad hoc corporate policy, such that the Court cannot decide on a motion for summary judgment that [he] was not a managing agent." <u>Garcia</u>, 2014 WL 4978434, at *7; <u>see also</u> <u>DesRosiers v. Hartford</u>, 979 F.Supp.2d 1036, 1053 (E.D. Cal. 2013) (despite description "as a mid-level manager who supervised only about 100 employees, a small fraction of Hartford's 29,000 employees nationwide," and argument that "corporate policies are developed and authorized by its home office executives in Hartford," the question of "[w]hether or not Hughes exercised ad hoc authority over Hartford policy requires a factual inquiry not suitable for summary judgment."); <u>Davis v. Kiewit Pac. Co.</u>, 220 Cal.App.4th 358, 373 (2013) ("a trier of fact could reasonably infer that, despite the fear Davis expressed to him regarding possible retaliation for her reporting of the portable toilet issues, Lochner exercised his authority and discretion to not enforce Kiewit's policy against retaliation and/or to protect her from retaliation and, in so doing, exercised authority that resulted in the ad hoc formulation of corporate policy."); <u>Marlo v. United Parcel Serv., Inc.</u>, 600 F. App'x 551, 552 (9th Cir. 2015) (noting that the California Supreme Court held in <u>White v. Ultramar</u> that a "single act of retaliatory termination demonstrated that a middle manager determined corporate policy," and thus a jury could reasonably conclude that the decision to terminate an employee after making statements that the employee's lawsuit was something that could negatively impact employee morale, "was a policymaking decision aimed at protecting the company culture.") (internal quotation marks and citations omitted).

This reference to the formulation of ad hoc policy is also established in the context of insurance agents, who, despite not being high in the corporate hierarchy in their setting of policy, dispose of insureds' claims with little to no supervision and thus are involved in the ad hoc

formation of corporate policy.  See, e.g., Egan v. Mutual of Omaha Insurance Co., 24 Cal.3d 809 (1979) (rejecting the argument that the agents were not managing agents because the "determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy.  Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.  When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation . . . The record demonstrates they exercised broad discretion in the disposition of plaintiff's claim."); Major v. W. Home Ins. Co., 169 Cal.App.4th 1197, 1219-20 (2009) (facts sufficient for jury to find agent was managing agent as she "exercised substantial discretionary authority to pay or not pay benefits owing," and "the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.") (internal quotation marks and citation omitted).  Jimenez-Robbins' position and actions described above, where a jury could find she essentially refused a claim for a reasonable accommodation, can be reasonably analogized to that of an insurance agent's denial of a claim in that it can set ad hoc corporate policy for the affected individual, or alter the way claims are handled in the future.

Accordingly, whether or not Jimenez-Robbins exercised ad hoc authority over Stoneledge's policies concerning leave, reasonable accommodation, and termination, requires a factual inquiry not suitable for summary judgment in this case and thus the Court cannot conclude as a matter of law that Jimenez-Robbins was not a managing agent for purposes of punitive damages.  The Court now turns to the question of whether Plaintiff can demonstrate oppressive, malicious, or fraudulent conduct.

2.      Whether a Jury could find the Conduct was Oppressive Malicious or Fraudulent

Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1).  Oppression is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard

of that person's rights." Cal. Civ. Code § 3294(c)(2). Conduct that is in blatant or knowing violation of the law may satisfy the requisite showing for punitive damages. See, e.g., Pac. Gas & Elec. Co. v. Superior Court, 24 Cal.App.5th 1150, 1170 (Ct. App. 2018) ("Punitive damages are appropriate if the defendant's acts are . . . in blatant violation of law or policy," however "mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages," and "some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.") (internal quotation marks and citations omitted); Flyer's Body Shop v. Ticor Title Ins. Co., 185 Cal.App.3d 1149 (1986) (same).

Here, as the Court found above, there are factual disputes about whether Defendant Stoneledge engaged in the interactive process in good faith and whether Defendant attempted to create an environment that would leave Plaintiff with no choice but to resign or be terminated instead of exercising his rights under the California disability discrimination laws. See DesRosiers v. Hartford, 979 F.Supp.2d 1036, 1053 (E.D. Cal. 2013) (factual disputes regarding whether employer engaged in good faith interactive process and created environment leaving Plaintiff no choice to resign precluded summary judgment on issue of punitive damages). Having reviewed the evidence in the record, the Court cannot conclude as a matter of law that no reasonable jury could find clear and convincing evidence that Defendant acted with "willful and conscious disregard" of Plaintiff's rights or subjected Plaintiff to "cruel and unjust hardship in conscious disregard" of Plaintiff's rights, particularly given the question of intent on the part of Defendant. Cal. Civ. Code § 3294(c); see also O'Brien as Tr. of Raymond F. O'Brien Revocable Tr. v. XPO CNW, Inc., 362 F.Supp.3d 778, 786–87 (N.D. Cal. 2018) (finding question of defendant's motive in dispute and thus summary judgment inappropriate as to punitive damages given the underlying claims survived, and punitive damages present a question of degree of punishment based on the peculiar circumstances of each case). Accordingly, the Court denies Defendant's motion because material facts exists making summary adjudication of Plaintiff's punitive damages claim improper.

# IV.

## CONCLUSION AND ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendants' motion for summary judgment (ECF No. 17) is GRANTED IN PART and DENIED IN PART as follows:

1. Plaintiff's disability discrimination claim is dismissed to the extent it is based on Plaintiff being disabled prior to November 3, 2017, or based on a policy requiring Plaintiff to stand on the sales floor during October of 2017, however Plaintiff's claim may proceed to the extent it is based on being disabled after November 3, 2017, and termination of Plaintiff's employment;

2. Plaintiff's failure to accommodate claim is dismissed to the extent it is based on a policy requiring Plaintiff to stand on the sales floor during October of 2017, however may proceed to the extent it is based on the termination of Plaintiff's employment or failure to accommodate a leave of absence due to disability;

3. Plaintiff's age discrimination claim is dismissed for failure to state a prima facie case;

4. Plaintiff's claim for wrongful termination in violation of public policy may proceed but only to the extent the claim is based on Plaintiff's disability discrimination claim or failure to accommodate claim;

5. Plaintiff's claims against Defendant Ashley Furniture Industries, Inc. ("AFI"), are dismissed to the extent they are based on Defendant AFI's status as an employer of Plaintiff; and

///
///
///
///
///
///
///

6.    Defendants' motion for summary judgment on Plaintiff's punitive damages claim

is DENIED.

IT IS SO ORDERED.

Dated:    **May 30, 2019**

UNITED STATES MAGISTRATE JUDGE